UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Gloria D. Wiseman,

                Plaintiff,

      –v–

ING Groep, N.V. et al.,

                Defendants.

16-cv-07587 (AJN)

MEMORANDUM &
ORDER

ALISON J. NATHAN, District Judge:

      In this action arising from a disputed exchange provision of a life insurance contract, Plaintiff Gloria Wiseman seeks to hold Defendants ReliaStar Life Insurance Company of New York, Voya Financial, Inc., and ING Groep N.V. liable for breaches of contract, breaches of the implied covenant of good faith and fair dealing, negligence, violations of New York General Business Law § 349, unjust enrichment, and intentional infliction of emotional distress. The Plaintiff also seeks declaratory judgment. Defendants have filed two motions to dismiss the Plaintiff's First Amended Complaint in its entirety. For the reasons explained below, the Plaintiff has failed to plausibly allege any of her claims except the breach of the implied covenant of good faith and fair dealing. Moreover, she has not plausibly alleged that Defendants Voya or ING are parties to her insurance contract, and they are thus not liable for any of her claims.

      As a result, the Court grants Defendant ING's motion to dismiss in its entirety, grants Defendants Voya and ReliaStar's motion to dismiss on all claims regarding Voya, and also grants that motion to dismiss on all claims other than the breach of the implied covenant of good faith and fair dealing as against ReliaStar.

1

## I.     Background

### A.     Parties

Plaintiff Gloria D. Wiseman is the owner of a life insurance policy insuring her mother, Olga Wiseman, which was purchased from Lincoln Security Life Insurance Company in 1991. First Amended Complaint ("FAC"), Dkt. No. 29, ¶¶ 3, 29.

Defendant ReliaStar Life Insurance Company of New York ("ReliaStar") is an insurance company organized and existing under the laws of New York that is the successor of Lincoln Security Life Insurance Company following the two companies' merger in 1998. *Id.* ¶¶ 12-13, 38.

Defendant Voya Financial, Inc. ("Voya") is an unauthorized foreign business corporation organized and existing under the laws of Delaware that was formerly known as ING American Insurance Holdings, Inc. and ING U.S., Inc. *Id.* ¶ 7. Defendant ReliaStar is owned by Voya and represents itself as acting within the "Voya® family of companies." *Id.* ¶¶ 8, 88-89.

Defendant ING Groep N.V. ("ING") is a *naamloze vennootschap* (or "public company") organized and existing under the laws of The Netherlands. *Id.* ¶ 4. ING was the sole owner of Defendant Voya between September 1, 2000 and approximately October 29, 2013. *Id.* ¶ 96.

### B.     Factual Background

#### 1.     The Insurance Policy

On October 16, 1991, Lincoln Security Life Insurance Company issued a flexible premium adjustable life insurance policy on Ms. Olga Wiseman. *Id.* ¶¶ 29, 46. At the time the policy was issued, Olga Wiseman was 70 years old. *Id.* ¶ 30. She is now 95 years old. *Id.* The policy provided for a death benefit of at least $300,000 plus accumulated value at a guaranteed

rate of 4.5%. *Id.* ¶ 31.  The Plaintiff, Gloria Wiseman, is the daughter of Olga Wiseman and is the owner of the insurance policy. *Id.* ¶¶ 3, 29.

In December 2014, Plaintiff received a document described as a "duplicate policy" of her insurance policy on her mother. *Id.* ¶ 32; *see* Exhibit 1 to FAC ("Policy"), Dkt. No. 29-1.  This duplicate policy is not a true duplicate of the original policy because it "contains no illustrations" and "no application and no signatures of either the policy owner, the insured, or any representative of the insurance carrier," and it "appears to be stitched together from various forms used at the time that the policy was issued." FAC ¶¶ 33-35.  As a result, Plaintiff contends that the Insurers[1] lost the original policy and that the terms of the original policy were as favorable "or . . . more favorable to the Plaintiff" than the terms contained in the duplicate. *Id.* ¶¶ 36, 52.  Plaintiff does not allege what more favorable terms were contained in the original policy.

One of the provisions contained within the life insurance policy was an option to exchange the flexible premium adjustable life insurance policy for a whole life policy or endowment. *Id.* ¶ 46.  The language of that provision (taken from the "duplicate policy" provided in 2014) states:

> EXCHANGE: You may exchange this Policy for a new Policy.  Such exchange may be to any plan of whole life or endowment that we issue at the time of exchange, except:
> (1.) Flexible premium adjustable life insurance; or
> (2.) Adjustable cash value plans.
> You may not exchange this Policy for Term insurance.
> Written notice for such exchange must be given to us 31 days in advance.  Evidence of insurability will not be required, this Policy must be surrendered.  The amount of insurance on the new policy may be for any amount up to, but not more than, (a), plus (b), less (c), where:
> (a) is the current amount of the Insured's Death Benefit under this Policy.

---

[1] Because the parties dispute which defendants are successors in interest or proper parties to the life insurance policy, "the Insurers" is used throughout the opinion when discussing Plaintiff's allegations to refer generally to any of the Defendants ultimately found to be successors or parties to the contract.

(b) is the cash value of the new Policy on the Date of Exchange.
(c) is the then current cash value of this Policy.
We will issue the new Policy in the same premium rate class as this Policy.  We will calculate the premium for the new Policy according to the rates in effect for the age and premium rate class of the Insured at the time of exchange.  All plans of insurance available for exchange are subject to plan requirements.  Such new Policy will be effective on the date of termination of this Policy.

Policy at 18; *see also* FAC ¶ 53.

The insurance policy was to mature in October 2016.  FAC ¶ 54.  In January and February of 2015, Plaintiff and her representatives called the Insurers to give notice that she was exercising the exchange provision.  *Id.* ¶ 55.  During those calls, Customer Service Representatives[2] acting as agents of the Insurers "expressly accepted Plaintiff's exercise of the Exchange provision and waived any requirement that the Notice be in writing or that the Notice follow any particular requirements."  *Id.* ¶ 56.

Plaintiff exercised the exchange provision a second time at the express direction of the Insurers by writing and sending an email on February 10, 2015 to Arthur Navarro at his voya.com email address.  *Id.* ¶ 57.  She stated, "The policy of my mother is expiring, I believe, but there is a clause in her policy that gives her the right to option to change to another type of life insurance still to remain in existence.  She and I wish to exercise that option."  *Id.* (emphasis omitted).  The language used in the email was suggested by the Insurers.  *See id.* ¶ 58.  This written notice was "expressly accepted" by the Insurers, as demonstrated in "written letters by Defendant dated April 24, 2015 and March 11, 2016."[3]  *Id.* ¶ 59.

---

[2] Among the agents through whom the Insurers accepted exercise of the exchange provision and waived the written notice requirement were Angela Cardinal, Yvette Loman, Lauren Rowe, Arthur Navarro, and "other individuals whose identity are known to Defendants."  *Id.* ¶ 56.

[3] Plaintiff does not identify which defendant she is referencing as the author of the April 24, 2015 and March 11, 2016 letters.  However, the April 24, 2015 letter is attached to Defendants Voya and ReliaStar's Memorandum in Support of the Motion to Dismiss and is issued on ReliaStar letterhead.  *See* Exhibit 3 to Memo. in Support of Mot. to Dismiss ("April 24 Letter"), Dkt. No. 34-3.

Plaintiff exercised the exchange provision a third time in a letter dated February 22, 2015. *See id.* ¶¶ 60-62. In that letter, Plaintiff stated that she was "giving [the Insurers] written notice that we wish to exchange this policy, for a similar policy with no age expiration, same premiums or less." Exhibit 1 to Memo. in Support of Mot. to Dismiss, Dkt. No. 34-1; *see also* FAC ¶¶ 61-62. Plaintiff thereafter "continued to engage in written correspondence and held telephonic conferences" with agents of the Insurers to provide notice that she wished to exchange the life insurance policy. FAC ¶¶ 71-72.

Despite these efforts, the Insurers ultimately refused to exchange Plaintiff's policy for another policy this third time. In a letter dated April 24, 2015, they stated, "Although the policy states that you may exchange the Policy for a new whole life policy, we do not have a whole life insurance plan available for issue on an insured age 93. The Policy's Exchange provision specifies that any requested exchange must be for a product available at the time of the exchange and is subject to plan requirements." April 24 Letter; *see also* FAC ¶ 75. Similarly, in a letter dated March 11, 2016, the Insurers stated that "the Company does not currently have a whole life or endowment insurance plan available for issue on an insured aged 94." FAC ¶ 76.

As a result of the Insurers' refusal to exchange the policy, it lapsed upon its maturity in October 2016, causing Plaintiff to lose all of the premiums paid into the policy over 25 years and losing any death benefit upon the death of her mother. *Id.* ¶ 80. Plaintiff also argues that she suffered injury because she and her mother overpaid premiums for 25 years in reliance on her ability to exchange the policy before its maturity, *id.* ¶ 81, the insurance policy became devalued on the secondary exchange market due to its inevitable lapse, *id.* ¶ 82, and she suffered mental and emotional harm when her 95 year-old mother "felt pressure to pass before October 2016 so that her family could obtain the full benefit of her life insurance policy," *id.* ¶ 84.

5

## 2. Corporate Administration of the Life Insurance Policy

On January 1, 1998, Lincoln Security Life Insurance Company merged with ReliaStar Financial Corporation and was renamed ReliaStar Life Insurance Company of New York. *Id.* ¶ 38. On September 1, 2000, ING Groep N.V.'s American holdings company, ING America Insurance Holdings, Inc. (now Voya), purchased ReliaStar. *Id.* ¶ 39. In order to receive approval from the New York State Insurance Department, ING and ReliaStar expressly represented to the Department that they would co-manage "actuarial and managerial control of life insurance policies." *Id.* ¶¶ 40-41. Thereafter, ReliaStar marketed itself under the ING brand, "using the ING orange lion logo, and [holding] itself out as acting at all times at the direction [of] ING." *Id.* ¶ 42. ReliaStar's software stated that its assessments were "'presented' by ING," and ReliaStar was "universally referred to in the life insurance industry as 'ING.'" *Id.*

ING Groep N.V. began divesting its American life insurance holdings in October 2013 pursuant to the 2013 Amended Restructuring Plan that arose from ING's receipt of a taxpayer bailout. *Id.* ¶ 97. At that time, ING's American holdings company became independent and rebranded itself as Voya. *See id.* ¶¶ 7, 42, 99. Thereafter, ReliaStar began representing itself "as acting in concert with the 'Voya® family of companies.'" *Id.* ¶¶ 88, 92. Sample policies list themselves as "presented by" ReliaStar but list the actual policies as originating from Voya and are affixed with a "Voya Financial" logo on every page. *Id.* ¶ 89; *see also* Exhibit 2 to FAC, Dkt. No. 29-2. In attempting to exchange her policy, Plaintiff corresponded only with individuals using voya.com email addresses, received letters "proudly includ[ing] a reference to ReliaStar's place within the Voya® family of companies," and was aware that all correspondence was "done in the name of and on behalf of 'Voya Financial.'" FAC ¶ 93.

Although ReliaStar marketed itself after 2013 as a Voya company, Plaintiff alleges that her policy continued to be administered "pursuant to ING . . . policies, practices and actuarial models." *Id.* ¶¶ 98, 100. Moreover, Plaintiff suggests that Voya continued to in effect be controlled by ING because the top management of the company while it was owned by ING continued to run Voya after it became an independent entity. *See id.* ¶¶ 98, 101.

### 3.    Present Suit

Plaintiff filed a complaint with this Court in September 2016. Compl't, Dkt. No. 1. Defendants Voya and ReliaStar filed a motion to dismiss the complaint. First Mot. to Dismiss, Dkt. No. 19. Plaintiff elected to amend her complaint in response to the motion to dismiss and filed the First Amended Complaint on January 2, 2017, alleging claims for breach of contract, breach of the implied covenant of good faith and fair dealing, negligence, violation of New York General Business Law § 349, unjust enrichment, declaratory judgment, and intentional infliction of emotional distress. *See generally* FAC. In addition, Plaintiff alleged claims on behalf of two classes – the "Lincoln Security Class," consisting of owners of life insurance policies issued by Lincoln Security Life Insurance Company that contained an exchange provision that was at any time unavailable for exchange, *id.* ¶ 114, and the "Legacy Policy Class," consisting of owners of life insurance policies "issued by any life insurance company with an exchange provision" that were at any time owned or administered by any of the Insurers and during that time who were unable to exercise the exchange provision, *id.* ¶ 115. All Defendants filed motions to dismiss the First Amended Complaint. *See* Mot. to Dismiss, Dkt. No. 32 (filed by Voya and ReliaStar); Mot. to Dismiss, Dkt. No. 39 (filed by ING).

## II.   Insurers' Motions to Dismiss Claims Under Rule 12(b)(6)

To survive a Rule 12(b)(6) motion, a plaintiff must allege facts sufficient "to state a claim

to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A

claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw

the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v.

Iqbal*, 556 U.S. 662, 678 (2009).  "In addition to the allegations in the complaint itself, a court

may consider documents attached as exhibits, incorporated by reference, or relied upon by the

plaintiff in bringing suit, as well as any judicially noticeable matters." *ACE Sec. Corp. Home

Equity Loan Tr. v. DB Structured Prods.*, 5 F. Supp. 3d 543, 551 (S.D.N.Y. 2014).  "If a

document relied on in the complaint contradicts allegations in the complaint, the document, not

the allegations, control, and the court need not accept the allegations in the complaint as true."

*Id.* (quoting *TufAmerica, Inc. v. Diamond*, 968 F. Supp. 2d 588, 592 (S.D.N.Y. 2013)).

### A.   Plaintiff Has Failed to State a Claim for Breach of Contract (Claims 1-3)

To state a claim for breach of contract under New York law, a plaintiff must allege: (1)

the existence of a contract, (2) the adequate performance of the contract by the plaintiff, (3)

breach of the contract by the defendant, and (4) damages.  *24/7 Records, Inc. v. Sony Music

Entm't, Inc.*, 429 F.3d 39, 41-42 (2d Cir. 2005).  To plead a breach of contract, the "plaintiff

must identify what provisions of the contract were breached as a result of the acts at issue."

*Wolff v. Rare Medium, Inc.*, 171 F. Supp. 2d 354, 358 (S.D.N.Y. 2001).

"Under New York law 'the initial interpretation of a contract is a matter of law for the

court to decide.'  Included in this initial interpretation is the threshold question of whether the

terms of the contract are ambiguous." *Alexander & Alexander Svcs., Inc. v. These Certain

Underwriters at Lloyd's, London*, 136 F.3d 82, 86 (2d Cir. 1998) (citation omitted).  A contract

term is ambiguous if it "could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 178 (2d Cir. 2004) (quoting *World Trade Ctr. Props., L.L.C. v. Hartford Fire Ins. Co.*, 345 F.3d 154, 184 (2d Cir. 2003)).  In determining if an insurance provision is ambiguous, courts focus on "the 'reasonable expectations of the average insured upon reading the policy.'" *Wider v. Heritage Maint., Inc.*, 827 N.Y.S.2d 837, 845 (Sup. Ct. 2007) (citation omitted); *see also Gaunt v. John Hancock Mut. Life Ins. Co.*, 160 F.2d 599, 602 (2d Cir. 1947) ("[I]nsurers who seek to impose upon words of common speech an esoteric significance intelligible only to their craft[] must bear the burden of any resulting confusion.").

If the Court determines that a contract term is ambiguous, it may not dismiss the claim under Rule 12(b)(6) because "[t]he meaning of a contract term that is susceptible to at least two reasonable interpretations is generally an issue of fact, requiring the trier of fact to determine the parties' intent." *U.S. Naval Inst. v. Charter Commc'ns*, 875 F.2d 1044, 1048 (2d Cir. 1989); *see also Eternity Glob. Master Fund*, 375 F.3d at 178.  "Under New York law, an insurer bears the burden of showing that there is no ambiguity in a policy." *K. Bell & Assocs., Inc. v. Lloyd's Underwriters*, 97 F.3d 632, 639 (2d Cir. 1996).

### 1. Insurers Had No Obligation to Provide an Exchange Policy They Did Not Already Generally Provide

The Court concludes that Plaintiff's insurance contract unambiguously required the Insurers to exchange the policy only for another policy that it offered at the time of the exchange, and that the Insurers therefore did not breach the terms of the contract.  The exchange term of the

policy expressly stated that an exchange could be "to any plan of whole life or endowment *that we issue at the time of exchange.*"  Policy at 18 (emphasis added).

Plaintiff acknowledges that the Insurers did *not* offer a whole life policy covering a woman of Olga Wiseman's age at any time after Plaintiff first requested a policy exchange. Plaintiff quotes two letters to that effect in the First Amended Complaint: In the first, dated April 24, 2015, the Insurers stated that they "do not have a whole life insurance plan available for issue on an insured aged 93." FAC ¶ 75.  In the second, dated March 11, 2016, the Insurers stated, "[T]he Company does not currently have a whole life or endowment insurance plan available for issue on an insured aged 94." *Id.* ¶ 76 (alteration in original).  In her Memorandum in Opposition to Defendants Reliastar and Voya's Motion to Dismiss, she expressly acknowledges that "upon ING Groep N.V.'s purchase of ReliaStar in 2000, the Defendants no longer had a policy available for exchange" for someone of Olga Wiseman's age.  Memo. in Opp. to Mot. to Dismiss, Dkt. No. 42, at 9.  Because the unambiguous language of the contract required the Insurers to exchange Plaintiff's policy only for another policy that was generally offered, and because Plaintiff concedes that no such policy existed that would cover Olga Wiseman at the time of Plaintiff's multiple requests for an exchange, the Insurers did not breach the contract by failing to exchange the policy.[4]

---

[4] Because the Court finds that the contract was not breached by the Insurers, it need not reach ReliaStar and Voya's alternative argument that Plaintiff cannot demonstrate her own performance of the contract – thereby preventing her from successfully alleging that the Insurers breached the contract – because she sought to add terms to the exchange provision, namely that the new policy have the same death benefit at the same or lower premiums than the exchange policy. *See* Memo. in Support of Mot. to Dismiss, Dkt. No. 33, at 8.  Plaintiff responds to this argument that she adequately performed her part of the contract and that her written request for a new policy that offered the same death benefit and the same or lower premiums was merely an expression of "'wishes' for certain terms" that did not undermine her performance of the contract.  Memo. in Opp. to Mot. to Dismiss at 6-7.  Because the Court concludes that Plaintiff has not alleged that the Insurers breached the policy contract *even if* she adequately performed her portion of the contract, it need not consider this alternative argument.

This conclusion is so because while the Court is required to interpret any ambiguous term of the contract in Plaintiff's favor, *see Gaunt*, 160 F.2d at 602, the Court does not find that any term in the phrase "to any plan of whole life or endowment that we issue at the time of exchange" is ambiguous. To the contrary, that phrase unambiguously means that the Insurers were only required to exchange Plaintiff's policy for a policy that RLNY issued at the time of the exchange.

Plaintiff never provides any alternative interpretation of the contract provision's language that might undermine Voya and ReliaStar's persuasive reading that the exchange provision only required an exchange to other policies generally offered at the time of the exchange. Instead, she merely argues that this broad *conception* of the exchange policy is incorrect and thus the provision must be ambiguous. *See* Memo. in Opp. to Mot. to Dismiss at 8-12. However, ambiguity only exists if a specific contractual term is susceptible to multiple readings, as demonstrated by the very cases to which Plaintiff cites. *See id.* at 5, 11 (citing *Eternity Global Master Fund* and *U.S. Naval Institute*).

For example, in *Eternity Global Master Fund*, the court considered the meaning of the phrase "mandatory transfer" in the context of a credit default swap transaction. 375 F.3d at 180-81. The court acknowledged that one party's interpretation of the phrase was "intuitively appealing" because logically the phrase "'mandatory transfer' cannot be an exchange offered on 'voluntary terms.'" *Id.* at 180. Nonetheless, the court held that the contract was ambiguous because the other party made a "less obvious but plausible argument" that the phrase "'mandatory transfer' includes any obligation exchange achieved by 'economic coercion,' regardless of its classification as 'voluntary' or 'mandatory' by the initiating party." *Id.* at 181. Similarly, in *U.S. Naval Institute*, the court considered the meaning of a contract term prohibiting

a publishing house from publishing the paperback version of a novel until October of a given year. 875 F.2d at 1048. The court concluded that the prohibition was ambiguous because "publishing" could have many plausible definitions:

> [T]he Agreement's prohibition on publishing sooner than October might reasonably be read to preclude a publisher from taking any steps toward publication, including printing and trade advertising, prior to October; or to bar any public revelation of the contents before October, as in the technical copyright sense; or to preclude any pre-October shipments; or to prohibit only pre-October retail sales.

*Id.* No similar ambiguity exists in any term of the contract provision at issue in the present case.

Rather than offering an alternative interpretation of the language the Court finds unambiguous, Plaintiff makes three arguments. First, she argues that the exchange provision should be read as requiring the Insurers to exchange any policy to prevent "an absurd result" that would strip the exchange provision of any force. Memo. in Opp. to Mot. to Dismiss at 10. To make this argument, Plaintiff suggests that an insurance provider would "sell a Policy priced and marketed on the basis of an exchange provision on Day One. Then, on Day Two, the life insurance company may hollow out their commitment by now choosing to no longer offer a Policy available for exchange to any policy owner." *Id.* It is true that under New York law, "a contract should not be interpreted to produce an absurd result," and a court will choose a reasonable interpretation that avoids such a result where possible. *Rubin v. Baumann*, 52 N.Y.S.3d 3, 4 (App. Div. 2017) (citation omitted). However, "the Court of Appeals has set a high bar for declaring a contract absurd." *Warberg Opportunistic Trading Fund, L.P. v. GeoResources, Inc.*, 973 N.Y.S.2d 187, 192 (App. Div. 2013). As a result, only contracts that very nearly produce the opposite effect of what the parties likely desired will be held to be absurd. *See, e.g., id.* at 189, 192 (finding a contract not absurd even though a "notwithstanding" provision "render[ed] inoperative a detailed formula in a correlated contract provision");

*Reichert v. N. MacFarland Builders, Inc.*, 445 N.Y.S.2d 264, 265 (App. Div. 1981) (rejecting an interpretation of a contract that "produces the absurd result that the less time plaintiff spent on the project, the greater the gross profit, and hence a correspondingly larger bonus would accrue"). The Court does not find that the situation posited by Plaintiff meets the high threshold for absurdity. Rather, it is to be expected that an insurer would not make itself beholden to offer policies to any person regardless of age and risk factors, and that the exchange provision effectuated this expectation.

Second, Plaintiff suggests that the Insurers' reading of the exchange provision "would be inconsistent with New York laws, rules, regulations, and standard industry practice." Memo. in Opp. to Mot. to Dismiss at 10. Plaintiff has not specifically alleged what provisions of New York laws, rules, regulations, or industry practices this reading would contravene: She points only to New York Insurance Law section 2403, which "prohibits the use of deceptive or misleading information in the presentation of life insurance policies." Memo. in Opp. to Mot. to Dismiss at 10. She does not explain what practices, if any, the Insurers took that were deceptive in their presentation of the policy or the exchange provision. As a result, she has presented only bare, conclusory allegations that are insufficient to survive a motion to dismiss. *See Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). Moreover, it may well be that if agents of Lincoln Security Life Insurance represented that the exchange provision ensured that a policy exchange would always be possible, the company violated section 2403. However, Plaintiff has not brought a claim based on that statute here, and illegal representations do not change the meaning of the actual contractual language this Court must interpret.

Finally, Plaintiff argues that another provision of the insurance contract stating that "*[a]ll coverage* under the Policy" would continue until the insured died or the policy matured or was surrendered, *id.* (quoting Policy at 10), obligated the Insurers to provide an exchange to some sort of policy upon request. However, because the exchange provision only required exchange to a then-offered policy by its unambiguous terms, the additional term similarly only required that the Insurers grant an exchange to a then-offered policy if a request was made and a relevant policy was then being generally offered.

### 2. Insurers Had No Contractual Obligations to Continue Providing Policies to Which Customers Could Switch or Notify Customers When It Altered Its Policy Offerings

The First Amended Complaint also alleges that the Insurers breached the insurance contract by (1) failing to maintain a policy for which Plaintiff could exchange her flexible policy, (2) not notifying Plaintiff when her policy could no longer be exchanged because no alternative policy existed to which she could switch, (3) overcharging premiums based on this lack of alternative policy, and (4) devaluating the policies by reducing their value on the secondary exchange market. *See* FAC ¶ 131.

Plaintiff has not alleged that any specific contract term required that the Insurers continue to offer a whole life or endowment policy for which Plaintiff could exchange her original policy. Instead, she has generally asserted that the Insurers were so obligated. *See id.* ¶¶ 129-31. She has similarly pointed to no contractual terms obligating the Insurers to notify her of its other policy offerings, reduce her premiums when she became ineligible for an alternative offered policy, or maintain the value of her policy on the secondary market. Her allegations are thus insufficient as a matter of law to support a breach of contract claim. In addition, her citation to New York Insurance Law section 3211, Memo. in Opp. to Mot. to Dismiss at 12, which requires insurers to notify insurance owners before coverage lapses, is inapposite by its terms to her

14

claims that she should have been notified about what *other policies* the Insurers offered.  It thus does not alleviate Plaintiff's failure to allege which contractual provisions the Insurers breached.

In sum, because the language of the exchange provision of the Plaintiff policy unambiguously limited the Insurers' obligation to only providing an exchange to another policy that was generally offered, and because Plaintiff concedes that the Insurers did not offer a policy that would insure Olga Wiseman at the time of the requested exchange, the Court finds that the Insurers did not breach the terms of the policy when they failed to offer Plaintiff a new life insurance policy for her mother.  Moreover, because the terms of the policy contained no language obligating the Insurers to maintain whole life policies to cover every person insured by a flexible exchange policy or to inform policyholders if such whole life policies became unavailable, Plaintiff has not plausibly alleged a breach of contract claim.

### B.    Plaintiff Has Sufficiently Alleged a Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing (Claims 4-6)

In addition to her breach of contract claim, Plaintiff also alleges breach of the implied covenant of good faith and fair dealing.  "Under New York law, there is a covenant of good faith and fair dealing implied in all contracts." *Fleischer v. Phx. Life Ins. Co.*, 858 F. Supp. 2d 290, 298 (S.D.N.Y. 2012).  "The covenant of good faith and fair dealing 'embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" *Evans v. Famous Music Corp.*, 807 N.E.2d 869, 875 (N.Y. 2004) (quoting *511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 773 N.E.2d 496, 500 (N.Y. 2002)).  This covenant encompasses "any promises which a reasonable person in the position of the promisee would be justified in understanding were included." *Id.* (quoting *511 W. 232nd Owners Corp.*, 773 N.E.2d at 501).  The obligation to deal fairly and in good faith is particularly high for the more powerful party in a contractual situation in which the parties "do

not deal as equals either in terms of access to information or business acumen and thus . . . often lack equal bargaining power." *511 W. 232nd Owners Corp.*, 773 N.E.2d at 501 (citation omitted).

A plaintiff may claim a breach of implied covenant "only if the claim is based on allegations different from the allegations underlying the accompanying breach of contract claim." *Fleisher*, 858 F. Supp. 2d at 299 (quoting *Deutsche Bank Sec., Inc. v. Rhodes*, 578 F. Supp. 2d 652, 664 (S.D.N.Y. 2008)). Accordingly, "[a] claim for breach of the implied covenant 'will be dismissed as redundant where the conduct allegedly violating the implied covenant is also the predicate for breach of covenant of an express provision of the underlying contract.'" *ICD Holdings S.A. v. Frankel,* 976 F. Supp. 234, 243-44 (S.D.N.Y. 1997) (citation omitted). "[I]n some cases 'a party may be in breach of its implied duty of good faith and fair dealing even if it is not in breach of its express contractual obligations.'" *Orange Cty. Choppers, Inc. v. Olaes Enters., Inc.*, 497 F. Supp. 2d 541, 559-60 (S.D.N.Y. 2007) (citation omitted).

Because the Court dismisses Plaintiff's claim for breach of contract, *see supra*, there is no need to dismiss this claim as redundant. *See id.* at 560 (dismissing plaintiff's breach of contract claim while denying the motion to dismiss plaintiff's claim for breach of the covenant of good faith and fair dealing based on same set of facts). In any event, for the reasons stated below, this claim is not duplicative of the breach of contract claim because it plausibly alleges that the insurance policy implied that the Insurers would take certain actions even if no explicit contractual provision so stated. Moreover, the Court concludes that Plaintiff has sufficiently alleged that the Insurers breached the implied covenant of good faith and fair dealing. Although no contractual provision required the Insurers to maintain a generally available policy for which she could exchange her original policy or to notify her when she would no longer be able to

exchange her policy because her mother was no longer eligible for the remaining whole life policies, it is plausibly alleged that a reasonable person purchasing the same insurance policy as Plaintiff would assume based on the exchange provision and other factors that the Insurers would maintain such a policy or would notify her and adjust her premiums if such a policy became unavailable. *Evans*, 807 N.E.2d at 875. It is also plausibly alleged that the failure of the Insurers to offer such a policy injured the right of Plaintiff to enjoy the fruits of the contract – her assurance that her mother would be insured when she passed. *Id.* Plaintiff has adequately alleged this breach in the First Amended Complaint. *See* FAC ¶¶ 160-63.

Voya and ReliaStar argue that finding a breach of the implied covenant of good faith and fair dealing here would improperly "alter the substantive obligations in the Policy." Memo. in Support of Mot. to Dismiss at 10. They cite a case called *Hildene Capital Management, LLC v. Friedman, Billings, Ramsey Group, Inc.*, No. 11-cv-5832 (AJN), 2012 WL 3542196, at *7-8 (S.D.N.Y. Aug. 15, 2012), in support of their position. However, *Hildene* concerned a contract between two corporations in which provisions of the contract "strongly suggest[ed] an intent to limit [the defendant's] obligations to those made explicit in the indentures." *Id.* at *7. In contrast, the Plaintiff has alleged that the insurance contract at issue in the present case concerns the reasonable expectations of a layperson in reading a contract drafted by a corporation. The relevant question is what a "reasonable person in the position of the promisee would be justified in understanding were included," particularly where the promisee possesses inferior information, business acumen, or bargaining power. *See 511 W. 232nd Owners Corp.*, 773 N.E.2d at 500-01. This is not a question the Court may resolve at this stage of the litigation.

Moreover, while the contract expressly limited the exchange provision to other life insurance policies offered at the time of the exchange, it has been plausibly alleged that a

17

reasonable customer in Plaintiff's position could have presumed that *some* policy would exist for which the customer could exchange the original policy or, in the alternative, that the Insurers would notify customers when it ceased carrying policies for which an exchange could be made or adjust their premiums when the exchange provision ceased to have effect due to an absence of alternative available policies. *See* FAC ¶ 161. As a result, Plaintiff has plausibly alleged that the Insurers "acted in bad faith by not having a policy into which Plaintiff could exchange her policy" and "by failing to notify Plaintiff that the option to exchange was lost." *Id.* ¶ 160.

### C.   The Plaintiff Has Not Sufficiently Pleaded a Claim for Negligence Independent of the Claim for Breach of Contract (Claims 7-9)

Plaintiff's negligence claims do not fare as well. Under New York law, "the elements of a negligence claim are: (1) that the defendant owed the plaintiff a duty; (2) that the defendant breached that duty; (3) that the plaintiff was injured, and (4) that the breach of the duty was the proximate cause of the plaintiff's injury." *2002 Lawrence R. Buchalter Alaska Tr. v. Phila. Fin. Life Assurance Co.*, 96 F. Supp. 3d 182, 218 (S.D.N.Y. 2015). "It is a well-established principle that a simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated." *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 516 N.E.2d 190, 193 (N.Y. 1987); *accord Dorking Genetics v. United States*, 76 F.3d 1261, 1269 (2d Cir. 1996). "In disentangling tort and contract claims," courts consider "the nature of the injury, the manner in which the injury occurred and the resulting harm." *Sommer v. Fed. Signal Corp.*, 593 N.E.2d 1365, 1369 (N.Y. 1992). Where "'the nature of [Plaintiffs'] injury and the resulting harm caused by the alleged breach of [Defendants'] tort duty are identical to the injury and harm caused by the alleged breach of contract,' the negligence claim must be dismissed as duplicative of the contract claim." *Millennium Partners, L.P. v. U.S. Bank Nat'l Ass'n*, No. 12-cv-

7581(HB), 2013 WL 1655990, at *5 (S.D.N.Y. Apr. 17, 2013) (alterations in original) (quoting

*Purchase Partners, LLC v. Carver Fed. Sav. Bank*, 914 F. Supp. 2d 480, 498 (S.D.N.Y. 2012)).

Plaintiff alleges that the Insurers owed her several duties which they breached:

(a.) a duty to notify Plaintiff when there was any substantial change in management, which would effect the ability of the Plaintiff to exercise her rights under the policy;

(b.) a duty to protect the value of the policy by ensuring all its riders and provisions could be exercised and – if for some reason a provision that was of the essence of the agreement could not be exercised – then to notify the Plaintiff of that change;

(c.) a duty to ensure that upon the purchase of a life insurance company that the successor company had knowledge of what policies were "on the books", their terms, and what requirements that created for the company;

(d.) a duty to conduct due diligence before taking responsibility for life insurance policies by purchasing companies;

(e.) to keep a copy of all in-force policies;

(f.) and other duties.

FAC ¶ 188. The injuries alleged in the First Amended Complaint that resulted from breaches of

these duties are "lapse of the Wiseman Policy and Plaintiff's inability to exchange the policy

upon demand." *Id.* ¶ 191.  Because the alleged duties arise out of the contractual relationship

between Plaintiff and the Insurers, and because the only harms alleged are the same as the

injuries alleged under Plaintiff's breach of contract claim, the Court finds that this claim is

duplicative and thus must be dismissed.

Plaintiff argues that the negligence claim is not duplicative because the Insurers had a

statutory duty to maintain a copy of her policy that is independent of their contractual duties. *See*

Memo. in Opp. to ING Mot. to Dismiss, Dkt. No. 48, at 10-11, 14-17.  However, even if the

Court were to accept this argument, Plaintiff has not alleged how the Insurers' loss of her

original policy was the proximate cause of any particular injury.  She has not alleged why the

loss of her policy, independent of the alleged breach of contract, caused her policy to lapse or

prevented her from exchanging her policy. Moreover, although she intimates that her original policy may have contained "language more favorable to the Plaintiff" than what was in the duplicate policy she received, *see* FAC ¶ 52; Memo. in Opp. to Mot. to Dismiss at 8 n.1, she has not alleged what that more favorable language was, and thus has failed to plausibly allege any injury based on the duplicate policy's terms or a reason why this Court should not rely on those terms in addressing her claims. Thus, even if Plaintiff were to succeed in alleging a duty independent of the contract, she has not plausibly alleged how a breach of these duties was the proximate cause of any injury, and the claim must therefore be dismissed.

### D.    Plaintiff's Claim Arising from New York General Business Law § 349 Is Time-Barred (Claim 10)

The Court next turns to Plaintiff's claim that there has been a violation of New York General Business Law section 349. That law prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service" within the state. N.Y. Gen. Bus. Law § 349(a). To state a claim for violating the statute, a plaintiff must allege that "the defendant has engaged in conduct that was (1) consumer oriented; (2) deceptive or misleading in a material way; and (3) the plaintiff suffered injury as a result." *Nials v. Bank of Am.*, No. 13-cv-5720(AJN), 2014 WL 2465289, at *3 (S.D.N.Y. May 30, 2014). "Although a monetary loss is a sufficient injury to satisfy the requirement under § 349, that loss must be independent of the loss caused by the alleged breach of contract." *Spagnola v. Chubb Corp.*, 574 F.3d 64, 74 (2d Cir. 2009).

The First Amended Complaint alleges that the Insurers violated section 349 when their agents represented that policies could be exchanged upon request.[5] FAC ¶¶ 215, 217-18. This

---

[5] Because the Court finds that the exchange term of the insurance contract was unambiguous and that Plaintiff has not sufficiently alleged that the actual terms of her policy were different from those of the policy attached to the First Amended Complaint, *see supra*, Plaintiff's allegation that "Defendants

claim is based on actions taken more than 20 years ago, and thus is barred by the three-year statute of limitations governing section 349. *See Marshall v. Hyundai Motor Am.*, 51 F. Supp. 3d 451, 461-62 (S.D.N.Y. 2014). This statute of limitations runs from the date on which the injury occurs rather than from when it is discovered by the plaintiff. And injury is interpreted as the purchase of a product that does not meet the represented specifications. *See id.* (holding that a claim under section 349 was time-barred where a defendant made misrepresentations regarding vehicles' defective brake system and plaintiffs did not experience defects, and thus did not sue, within three years of purchasing the vehicle); *see also In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, Nos. 04-cv-2389(SAS), -3417(SAS), -5424(SAS), 2007 WL 1601491, at *14 (S.D.N.Y. June 4, 2007) ("No discovery rule is applicable to section 349 claims.").

Moreover, plaintiffs are not entitled to equitable tolling of the statute of limitations when they do not act with reasonable diligence by investigating the defendant's potential misleading statements. *See Marshall*, 51 F. Supp. 3d at 463-64. Here, Plaintiff's injury began when she was induced to purchase a policy that only offered exchanges to policies that the Insurers were offering generally at the time of exchange and when she began paying premiums which she claims were unduly high as a result. *See, e.g.*, FAC ¶¶ 217-18, 225. Moreover, she cannot claim equitable tolling prior to her discovery of the exchange provision's meaning because it was written in unambiguous terms in her policy. *See* Policy at 18. As a result, any investigation would have alerted her within the three-year statute of limitations to the allegedly deceptive practices used by the Insurers and would have allowed her to bring a timely claim.

Thus, Plaintiff's claim under New York General Business Law section 349 falls well outside the statute of limitations and is thus dismissed.

---

represented in their life insurance agreements that policies would be exchanged upon request," FAC ¶ 214, is foreclosed.

### E.    Plaintiff Cannot Plausibly Allege a Claim Based on Unjust Enrichment (Claim 11)

The Court also dismisses Plaintiff's unjust enrichment claim.  "[W]hen a 'matter is controlled by contract,' the plaintiff has no valid claim for unjust enrichment under New York law." *Marshall*, 51 F. Supp. 3d at 471 (citation omitted).  Because this suit is governed by an existing contract, *see* Policy at 18, and because Plaintiff has failed to sufficiently allege that the original policy actually differed in any material way from the duplicate attached to the First Amended Complaint, she is foreclosed from claiming unjust enrichment in this case.

### F.    The Court Declines to Hear the Claim for Declaratory Judgment (Claim 12)

Plaintiff asks the Court to declare "that Defendants are obligated to provide all policy owners with an option to exchange upon demand, and that Defendants are obligated to immediately do all things necessary to allow the policies to be exchanged." FAC ¶ 234.  In determining whether to exercise discretion and hear a claim for declaratory judgment, courts consider "(1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) whether a judgment would finalize the controversy and offer relief from uncertainty," as well as "whether the proposed remedy is being used merely for 'procedural fencing' or a 'race to res judicata'; [] whether the use of a declaratory judgment would increase friction between sovereign legal systems or improperly encroach on the domain of a state or foreign court; and [] whether there is a better or more effective remedy." *Dow Jones & Co. v. Harrods Ltd.*, 346 F.3d 357, 359-60 (2d Cir. 2003).

In this case, the Court declines to hear a claim for declaratory judgment.  To the extent the First Amended Complaint survives the Insurers' motions to dismiss, the damages claims concern the same acts by the Insurers as the claim for declaratory judgment, thus rendering the latter redundant.  To the extent the First Amended Complaint's claims have been dismissed, a

declaratory judgment would be no more than an advisory opinion that this court has no jurisdiction to issue. The Court disagrees with Plaintiff that a declaratory judgment would do anything further to "finalize the controversy and provide relief for Plaintiff and others who would face a similar situation." Memo. in Opp. to Mot. to Dismiss at 23.

### G.   Plaintiff Has Not Sufficiently Alleged a Claim for Intentional Infliction of Emotional Distress (Claim 13)

As to Plaintiff's intentional infliction of emotional distress claim, this too fails as a matter of law. To make out a claim for intentional infliction of emotional distress under New York law, a plaintiff must allege "(1) extreme and outrageous conduct by the defendants; (2) an intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct and injury; and (4) severe emotional distress." *Wiener v. Unumprovident Corp.*, 202 F. Supp. 2d 116, 122 (S.D.N.Y. 2002). To constitute extreme and outrageous conduct, the defendant's actions must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Seltzer v. Bayer*, 709 N.Y.S.2d 21, 23 (App. Div. 2000) (quoting *Fischer v. Maloney*, 373 N.E.2d 1215, 1217 (N.Y. 1978)). "This threshold of outrageousness is so difficult to reach that, of the intentional infliction of emotional distress claims considered by the Court of Appeals, 'every one has failed because the alleged conduct was not sufficiently outrageous.'" *Id.* (quoting *Howell v. N.Y. Post Co.*, 612 N.E.2d 699, 702 (N.Y. 1993)). The few claims that have sufficiently alleged intentional infliction of emotional distress in New York courts have contained allegations "detailing a longstanding campaign of deliberate, systematic and malicious harassment of the plaintiff." *Id.*

Plaintiff cannot make out a claim for intentional infliction of emotional distress because she has not alleged that the Insurers were engaged in a pattern of malicious actions against her or

other actions utterly intolerable to a civilized society. Rather, she has alleged only that the Insurers refused to offer her a new insurance policy under the unambiguous terms of her existing insurance policy. Although Plaintiff states that the Insurers "threaten[ed] that a life insurance policy on a 95-year-old woman would lapse if she survived through its term," *see* FAC ¶ 240, the facts of the First Amended Complaint do not actually describe any threatening statements or actions taken by any agent of the Insurers or allege any actions taken with malice by the companies. Rather, Plaintiff describes only corporate agents carrying out the terms of a contract to which the corporation was a party. While some might argue that the Insurers' action in refusing to offer Plaintiff a new insurance policy was hardly laudable, the allegations fall far short of the high bar for intentional infliction of emotional distress claims set by New York courts. *See Seltzer*, 709 N.Y.S.2d at 23.

In sum, Plaintiff has sufficiently stated a claim for relief only on the basis of a breach of the implied covenant of good faith and fair dealing. The Court thus considers which Insurers are proper defendants to this claim.

**III.   Both Voya and ING Are Dismissed Because No Claims Can Be Properly Brought Against Them Regarding the Plaintiff's Insurance Policy**

Plaintiff seeks to hold Voya and ING liable for her claims, although they were not a party to the insurance contract, by alleging that they were "affiliates, parent companies, agents, representatives, co-venturers, subsidiaries of . . . and otherwise alter-egos of" ReliaStar, the party who took responsibility for Plaintiff's policy after it merged with Lincoln Security Life Insurance Company. *See* FAC ¶¶ 38, 85. "[L]iability is never imposed solely upon the fact that a parent owns a controlling interest in the shares of a subsidiary." *Degraziano v. Verizon Commc'ns, Inc.*, 325 F. Supp. 2d 238, 246 (E.D.N.Y. 2004) (quoting *Manchester Equip. Co. v. Am. Way & Moving Co.*, 60 F. Supp. 2d 3, 6 (E.D.N.Y. 1999)). Nor will the parent corporation

be held liable for the acts of a subsidiary corporation merely because the two used the same

brand name or even "collaborated on certain aspects of a transaction." *Nuevo Mundo Holdings*

*v. Pricewaterhouse Coopers LLP*, No. 03-cv-0613 (GBD), 2004 WL 112948, at \*3 (S.D.N.Y.

Jan. 22, 2004); *see also SUS, Inc. v. St. Paul Travelers Grp.*, 905 N.Y.S.2d 321, 324-25 (App.

Div. 2010).

Instead, a parent company can be held liable if the subsidiary company is a mere alter ego

of the parent.  To make out such a claim, the plaintiff must demonstrate that "(1) the owner

exercised such control that the corporation has become a mere instrumentality of the owner, who

is the real actor; (2) the owner used this control to commit a fraud or 'other wrong'; and (3) the

fraud or wrong results in an unjust loss or injury to the plaintiff." *Nuevo Mundo*, 2004 WL

112948, at \*6.  "[A] claim sufficient to 'overcome the presumption of separateness afforded to

related corporations' is not established by the bare allegation that one corporation dominated and

controlled another." *Kiobel v. Royal Dutch Petrol. Co.*, 621 F.3d 111, 195-96 (2d Cir. 2010)

(quoting *De Jesus v. Sears, Roebuck & Co., Inc.,* 87 F.3d 65, 70 (2d Cir. 1996)).  Rather, the

plaintiff must demonstrate complete domination by reference to a series of factors, such as:

> (1) the absence of the formalities and paraphernalia that are part and parcel
> of the corporate existence, i.e. issuance of stock, election of directors,
> keeping of corporate records and the like, (2) inadequate capitalization, (3)
> whether funds are put in and taken out of the corporation for personal rather
> than corporate purposes, (4) overlap in ownership, officers, directors, and
> personnel, (5) common office space, address and telephone numbers of
> corporate entities, (6) the amount of business discretion displayed by the
> allegedly dominated corporation, (7) whether the related corporations deal
> with the dominated corporation at arm's length, (8) whether the
> corporations are treated as independent profit centers, (9) the payment or
> guarantee of debts of the dominated corporation by other corporations in the
> group, and (10) whether the corporation in question had property that was
> used by other of the corporations as if it were its own.

*Nuevo Mundo*, 2004 WL 112948, at \*7.

Of the three Insurers who are defendants in this suit, only ReliaStar acknowledges that it is potentially liable for any sufficiently pled claim brought by Plaintiff in the First Amended Complaint.  Both Voya and ING argue that they have never been successors in interest to Plaintiff's insurance policy and that, although being parent companies of ReliaStar at different periods during which ReliaStar was administrator of the policy, neither exercised dominion over ReliaStar sufficient to hold them liable for ReliaStar's conduct.  The Court agrees.  As explained below, Plaintiff has failed to adequately allege that either Voya or ING exercised dominion over ReliaStar such that it should be held liable for the subsidiary's alleged breach of the implied covenant of good faith and fair dealing.

A.     **Voya**

The First Amended Complaint acknowledges that Voya and ReliaStar are separate entities incorporated in different states.  *See* FAC ¶¶ 7-14.  However, it alleges that Voya was "the actual administrat[or] of the Wiseman Policy."  *Id.* ¶ 87.  Plaintiff bases this allegation, first, on the fact that ReliaStar "has always represented itself as acting in concert with the 'Voya® family of companies.'"  *Id.* ¶ 88-89.  However, even accepting this as true, the fact that ReliaStar acted under the Voya brand name is insufficient to create liability for Voya.  *See Nuevo Mundo*, 2004 WL 112948, at *3.  Moreover, even the sample policy provided by Plaintiff as an exhibit to the First Amended Complaint which states that ReliaStar is part of the Voya family also clearly states that the actual policy is administered by ReliaStar.  *See* Exhibit 2 to FAC, Dkt. No. 29-2, at 1.

Second, Plaintiff alleges that "within the actuarial, managerial, and administrative side of ReliaStar policies all decisions are made solely by Voya and its personnel."  FAC ¶ 92.

However, this statement is no more than a conclusory allegation which the Court need not accept absent some plausible factual allegations in support.

Third, Plaintiff offers that "all correspondence with the Plaintiff by Defendants were done in the name of and on behalf of 'Voya Financial.'" *Id.* ¶ 93.  However, the fact that ReliaStar personnel used voya.com email addresses or mentioned ReliaStar's relationship to Voya is no more than a different form of the argument that the two identified under the same brand, which courts have found insufficient as a matter of law to establish alter egos. *See Nuevo Mundo*, 2004 WL 112948, at *3.

Plaintiff additionally argues that because Voya directly corresponded with her regarding the insurance policy, the company is now estopped from claiming it is not a party to the policy. FAC ¶ 94.  However, equitable estoppel is an "extraordinary remedy" that "should be invoked sparingly and only under exceptional circumstances," such as "where the insured is induced by fraud or misrepresentation." *Clement v. Farmington Cas. Co.*, No. 13-cv-1026 (NSR), 2015 WL 6971565, at *4 (S.D.N.Y. Nov. 10, 2015) (citations omitted).  Here, Plaintiff has not plausibly alleged that Voya used fraud or misrepresentation to mislead her into believing that Voya rather than ReliaStar was the administrator of the life insurance policy.  That she spoke to individuals who used Voya email addresses does not plausibly suggest that ReliaStar made misrepresentations or acted fraudulently.  This single allegation is insufficient by itself to "nudge[]" Plaintiff's claim "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

As a result, the Court concludes that Voya is neither a party to Plaintiff's insurance policy nor a successor in interest of a party.  Thus, Voya cannot be liable for any claims arising out of Plaintiff's policy and is therefore dismissed from the present action.

### B.    ING

Plaintiff's claims similarly fail as a matter of law in relation to ING – a defendant as to which Plaintiff makes even fewer allegations of sameness with ReliaStar. Plaintiff had no contact with anyone purporting to be an agent of ING. Rather, she alleges that "the Wiseman Policy was administered pursuant to ING Groep N.V.'s policies, practices and actuarial models," FAC ¶ 98 (capitalization omitted), and that ING continued administering the policy under a different name after its "hasty retreat from the American market," *id.* ¶ 99. Plaintiff's first assertion is no more than a bare allegation that is insufficient to defeat a motion to dismiss. *Iqbal*, 556 U.S. at 678. In support of her second assertion, Plaintiff relies on the fact that the same executives remained in control of Voya after ING divested. FAC ¶ 101. However, Plaintiff does not allege that ING's managers were also managers of ReliaStar; rather, she argues that ING's managers continued to act as managers of Voya – a corporation that, as explained above, was also not an alter ego of ReliaStar. Plaintiff also alleges that ReliaStar operated under the ING logo for a period of time – an allegation that, as already explained, is insufficient to create an alter ego.

Thus, the Court concludes that Plaintiff has failed to sufficiently allege that ING was a party to the insurance contract belonging to Plaintiff or a successor in interest to a party. ING is therefore also dismissed from this action.

### IV.    Conclusion

Defendants Voya Financial, Inc. and ReliaStar Life Insurance Company of New York's motion to dismiss, Dkt. No. 32, is granted on all claims as to Voya and is granted as to all claims except Claims 4-6 (breach of implied covenant of good faith and fair dealing) as to ReliaStar. Defendant ING Groep, N.V.'s motion to dismiss, Dkt. No. 39, is granted in toto.

This resolves docket numbers 19, 32, and 39.

28

The Court will schedule an initial pretrial conference in this matter by separate order.

SO ORDERED.

Dated: September 28, 2017
New York, New York

ALISON J. NATHAN
United States District Judge