# Exhibit B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------

GLORIA D. WISEMAN,

Plaintiff,

Case No.: 1:16-cv-7587

v.

ING GROEP, N.V., VOYA FINANCIAL; and RELIASTAR LIFE INSURANCE COMPANY OF NEW YORK;

Defendants.

------------------------------------------

DEPOSITION OF GLORIA D. WISEMAN
THURSDAY, FEBRUARY 1, 2018
10:30 a.m.

Reported by: Adrienne M. Mignano, RPR
Job Number: J1248847

February 1, 2018
10:30 a.m.
New York, New York

Deposition of GLORIA D. WISEMAN, held at the offices of Esquire Deposition Solutions, 1384 Broadway, New York, New York, pursuant to Notice, before Adrienne M. Mignano, a Notary Public of the State of New York.

A P P E A R A N C E S:

LAW OFFICE OF BARUCH S. GOTTESMAN
Attorneys for Plaintiff
185-12 Union Turnpike
Fresh Meadows, New York 11366
BY: BARUCH S. GOTTESMAN, ESQ.

KAPLAN JOHNSON ABATE & BIRD LLP
Attorneys for Defendants
710 W. Main Street
Louisville, Kentucky 40202
BY: CLARK JOHNSON, ESQ.

IT IS HEREBY STIPULATED AND AGREED, by and between the attorneys for the respective parties herein, that filing and sealing of the transcript be waived, and the same are hereby waived.

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question, shall be reserved to the time of the trial.

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be sworn to and signed before any officer authorized to administer an oath, with the same force and effect as if signed and sworn to before the Court.

Page 5

G. Wiseman

GLORIA WISEMAN, called as a witness, having been affirmed was examined and testified as follows:

EXAMINATION BY

MR. JOHNSON:

Q Dr. Wiseman, would you state your full name for the record.

A Gloria, G-L-O-R-I-A, Diana, D-I-A-N-A, Wiseman, W-I-S-E-M-A-N.

Q Dr. Wiseman, next question, have you ever given a deposition before?

A I don't think so. There might have been once. I was never sued. But I believe once I was given -- included in a deposition even though I wasn't being sued. So it is possible I had one.

Q Was that a long time ago?

A Oh, yeah.

Q Well, let me refresh your recollection about how this process works today.

I'm going to be asking questions, obviously, and the stenographer is going to be taking down what everyone

Page 6

G. Wiseman

says.

If you let me finish my question before you answer, it makes her job a lot easier. And, likewise, I'll let you finish your answer before I ask the next question.

If you can give your answers audibly, shaking your head is something that doesn't show up on the transcript.

A I'll try. Sorry.

Q That's quite all right.

And if you don't understand one of my questions, just let me know and I'll try to rephrase it.

Your counsel indicated before we started that you may need to take some breaks today, that's fine. Just let me know --

A Hopefully not.

Q Let me know if at any point you want to take a break, and we'll do that.

Dr. Wiseman, have you been a plaintiff in any case other than the case we're here on today?

Page 7

G. Wiseman

A No, not to my recollection, no.

Q How about a defendant in any lawsuit; have you been a defendant?

A No, that's why I said I was never sued.

Q How many life insurance policies do you own right now?

A Two. The one with -- it's hard to keep track of the names. ING, Voya ReliaStar; and I have another one.

Q Who is the second one with?

A John Hancock.

Q And do both of those policies insure your life?

A Only mine.

Q We'll talk about the policy you have with ReliaStar, obviously, today.

When did you buy the John Hancock policy?

A It was part of my job. When I was at one of the hospitals, they offered it. It was in the 1990's.

Q That's the same decade that you bought your contract with ReliaStar?

Page 8

G. Wiseman

A Yes, because I was going to leave the hospital and I wasn't sure that they could roll it over to me.

Q Is the John Hancock policy a whole life policy?

A Yes.

Q What is the face amount of the death benefit?

A It was increased recently, but now it is 1.6 million.

Q And what is your approximate annual premium for that contract?

A Around $720 a year.

Q Has that increased also?

A No. It actually decreased.

Q What did it decrease from?

A $12,000 a year to 720.

Q So you had been paying $12,000 a year?

A Yes.

Q For how many years?

A Since around two years ago, since the mid 1990s. I had it from the early 1990s but supposedly wasn't coming

Page 9

G. Wiseman

with me.

Q With respect to the ReliaStar contract that you own, why did you buy that contract?

MR. GOTTESMAN: Can we go off the record for a second?

MR. JOHNSON: Sure.

(Discussion held off the record)

BY MR. JOHNSON:

Q I'll repeat the question.

Why did you buy a ReliaStar life insurance policy on your own life?

A I had concerns about whether this other policy would come with me.

Q The John Hancock policy?

A Yes, because I wanted to go back to Columbia. Columbia does not offer that type of insurance and I'm a big believer in whole life and my mother and I are believers in there can't be too much insurance.

My father had an accident and died when I was young as a teenager. I had to put myself through all of college,

Page 10

G. Wiseman

postgraduate and everything and it was difficult. So I wanted to be sure that I provided for my children, whether or not they existed at the time. I knew that at some point, with God's help, I would have children and I wanted to provide.

Q And so having decided that you wanted to buy additional insurance, what did you do to make that happen?

A Murray Zucker is an agent of insurance and he is -- his wife is a cousin of my mother and sold insurance to her and financially she dealt with him.

So he had heard through my mother that I was looking, and he approached me. I mentioned his company and I was very clear about wanting whole life insurance and I wanted to have stuff left for my children.

Q So you told Mr. Zucker back in the 90s when he approached you that you wanted whole life insurance?

A Yes, absolutely.

Q And he presented this ReliaStar

Page 11

G. Wiseman

contract to you as whole life insurance?

A Yes, and he said that, you know, he had to sell it to my mother. I couldn't foretell the claims, he didn't know either that there would be a problem later; and if there were any issues, it could be exchanged. And I was very clear about it. Because I exchanged the John Hancock when I realized there was a problem with writing Voya ReliaStar. And I went looking to see any type of issues and, therefore, I exchanged it to make certain that there would be no age limit, that I didn't have to die at a certain time. And if I could raise it, fine. And because my initial happened on whole life, it had a foundation with which to pay off, you know, to exchange it, and to roll it in that I would also pay less, which was another benefit.

So it didn't even occur to me, you know, to question my mother's cousin's husband.

Q You mentioned, Dr. Wiseman, just

Page 12

G. Wiseman

now that you exchanged some contract for another?

A John Hancock.

Q So you exchanged the John Hancock contract for what?

A After I found out about the problems with my mother, I needed to check to make certain that I would have no such issues of needing to die before a certain age. And that wasn't as whole life as I thought. So I exchanged the John Hancock. So why would I not want to exchange the ING?

Q So what did you exchange the John Hancock for, another John Hancock policy?

A Yes.

Q When did you do that?

A Around two years ago. A year-and-a-half two years ago.

Q So your John Hancock policy initially was not a whole policy?

A It was.

Q Then what did you exchange it

G. Wiseman

for?

A Because the premiums were going to go up as I got older and I had concerns that the premiums were going up that high in the 70's, et cetera, is there some sort of question about when I needed to die. And when I didn't get the answer that I wanted to hear, I decided it wasn't practical to pay the kind of premium, you know, and keep it going up and up. And I asked him about exchange and they said yes and even provided an agent and named an agent and I exchanged it.

Q Who is that agent?

A John Agee.

Q Is that Bruce Agee?

A Bruce Agee; A-G-E-E.

Q So he was introduced to you by John Hancock?

A Yes. And then I met with him to see whether or not I trusted him, et cetera, et cetera.

Q And you did?

A Yeah.

G. Wiseman

Q Have you looked to buy a whole life insurance policy from another company in place of the ReliaStar contract that you currently own?

A No, I was promised that I would be able to exchange this one.

Q And who promised you that?

A When I bought it. That's what I was told.

Q Who told you that?

A Murray Zucker. And it was in the initial -- what was written, that it could be exchanged for another whole life. It turns out this one was a flexible something, a flexible policy. And it is written in it. And I did see that it was for whole life. It could be exchanged.

Q Did you receive a copy of your contract when you purchased it?

A At the time my mother and I lived in the same apartment, so it was there. It is possible. I thought she had it or Murray Zucker had it. I know that I read it. What happened to it afterwards,

G. Wiseman

I don't recall.

Q So you did receive a copy of the contract around the time that you bought it?

A I saw something at the time. I assumed, unfortunately, it was Murray Zucker's and I would get my own. I was very busy. I worked very hard.

Q I just want to understand.

I thought I had heard somewhere that you didn't ever receive a copy of the contract; is that true?

A From ING? I don't think so. Murray Zucker showed me what he had written, and I know it said whole life. Otherwise I never would have bought it and that it could be exchanged if there were any issues. I'm positive about the exchange in the whole life because I would never have bought it.

Q So you're positive that the contract you bought was a whole life policy or you wouldn't have bought it?

A Correct.

G. Wiseman

Q Other than Mr. Zucker, did you deal with anyone in connection with buying your contract with ReliaStar?

A No. As I said, he was my mother's cousin's husband, and I assumed he could be trusted. And, like I said, when it came to John Hancock, I didn't use Murray Zucker. I used someone else.

Q Are you disappointed in Mr. Zucker's performance here?

A Well, I was hoping he would -- I don't know. He was doing the best he could, I guess, he explained, with what he had to work with. He was trying, I think he felt, to do the best he could at the time.

But as I said, I would never have bought the policy if I had known it was not whole life and could not be exchanged. And he was also led to believe, as he told me, that it was whole life and it could be exchanged if there were any issues.

Q What did you understand him to

Page 17

G. Wiseman

mean when he said he was doing the best he could?

A He said with what was offered at the time. I don't like to say what was offered at the time. At the time there was whole life, and that's really what I wanted; and if it wasn't, then I wouldn't have bought it.

His understanding from Lincoln, and then it changed many hands, that it absolutely was exchangeable. And I would stick to this was a whole life type allegedly and could be fully whole life or whatever, not so flexible. I don't know what flexible does to whole life. I don't have that economic knowledge.

Q Have you asked ReliaStar to exchange your policy for a whole life policy?

A Yes.

Q When did you do that?

A Well, I had started to, but I need to focus on my mother first because we lost it because of her age. So it

Page 18

G. Wiseman

became of dire importance. And so I realized I would deal with her first or hopefully both at the same time. So it became a moot point after I verbally, many times in writing asked, and then did not. I felt that I had my back on the line, as I'm only one person.

Q What is the maturity date on your contract with ReliaStar?

A I thought there would be no maturity date, but apparently it's the same like my mother's.

Q It's already expired?

A No, I'm not my mother's age; but it will expire at some point and nobody has any guarantee. Longevity runs in the family, so I don't want my sons to be put in the same position.

My mother -- to say that she is upset is putting it mildly, she has lost her will to live because she keeps on apologizing for having outlived the policy.

And I'm a single mother and I

Page 19

G. Wiseman

don't want my sons to feel any problem. I mean, they have had a difficult enough life. I want to provide a lot for them and have been trying to provide.

It is very sad that you are able to provide more when somebody dies, but I don't want them to have any concerns about having a grandmother or a mother going to be apologizing continuously for having outlived the policy.

Q So why don't you quit paying for your ReliaStar contract and go buy a whole life policy with some other company?

A That may be next up, but why should I throw away the 1874 that I paid since, when is it, 1994? Those are quite a few years.

Q And the contract has significant cash value, doesn't it?

A Possibly. I need to look into it further. Unfortunately, it is easier to exchange a policy within the same company. If you go to another company, you're starting from scratch. So I don't

Page 20

G. Wiseman

want to throw away what I have.

Q And you haven't given written notice to exchange your contract on your life to ReliaStar?

A Because my mother came first.

Q I'm just asking -- I'm not asking why. I'm just asking whether that is a fact.

A That is my intention, but my mother came first.

Q Let's talk about your mother's contract. That's the contract that is at issue in this lawsuit, isn't it?

A Yes.

Q Were you involved in any way in your mother's purchase of that contract?

A I didn't buy it for her. She was dealing with Murray Zucker who was her sole financial person as well as insurance, and we discussed whole life and the importance of whole life and not just term or anything like or anything that's not totally whole life, that it should have -- bring money on the side and build

Page 21

G. Wiseman

itself up and et cetera, et cetera, that it should be worth something.

You never know what life holds for you as both of us have found. Life has a lot of surprises, and I believe in a Plan A and a Plan B.

Q So when you say "we discussed that it should be whole life," who had that discussion?

A My mother and I.

Q Were you present in any meetings between your mother and Mr. Zucker in connection with her decision to buy this contract?

A When she was talking with Murray Zucker on the phone, at some point I got on and I made certain that he understood that it was to be whole life and to be able to be built up, blah, blah, blah. She should live for many years, and hopefully we don't need to collect on it too soon. But it should be what I, in my research, found would be the best way to go would be a whole life.

Page 22

G. Wiseman

Q So it is your testimony that you were involved in discussions in connection with your mother's decision to purchase a life insurance policy?

A Well, I made it very clear to her. And I said it to Murray Zucker, but I was not -- she dealt with him directly. I mean, he is a relative so we speak from time to time. So -- but I felt it was understood.

Q So your knowledge of her dealings with Mr. Zucker secondhand, what she told you about her conversation with Mr. Zucker?

A Her dealings with Mr. Zucker to a certain extent may be secondhand was -- I work very long hours, but I had made to her my recommendations, as I thought I had made to him. And when, later on, I was offered allegedly the same thing from the same company, I was very clear on what I wanted.

Q And that was a whole life policy?

Page 23

G. Wiseman

A Yes.

MR. JOHNSON: Let's mark this as Exhibit 1, if we could.

(Whereupon, Contract by Lincoln Life Insurance Company, was marked as Defendants' Exhibit 1 for identification, as of this date.)

BY MR. JOHNSON:

Q Dr. Wiseman, I've marked as Exhibit 1 a copy of a contract issued by Lincoln Security Life Insurance Company.

A Uh-huh.

Q If you flip four pages in, you will see a policy data sheet.

Do you see that?

A Yes.

Q And you see your mother's name there?

A Under "Insured"?

Q Correct.

A Yes.

Q Is what I have handed you a copy of your mother's life insurance contract that is now owned by ReliaStar?

Page 24

G. Wiseman

A That's my understanding. I'm not present to know who owns and who doesn't own what.

Q Does this look like the contract that --

A She does not have the original waiver either.

Q I think you told me that you looked at the contract --

A Something that was in Murray Zucker's hand that he claimed was like their contract or was a sample of their contract.

Q Do you recall at this point whether it was substantially the same as the document in front of you now as Exhibit 1?

A I did not check my mother's. I only tried to check on mine. I tried to be very clear about it.

My mother is an independent woman.

Q So she made her own decision in buying this contract in 1991?

Page 25

G. Wiseman

A No. Based on her knowledge and belief, and she felt the same way of whole life, all I'm saying about is the fact that I worked, unfortunately, very long hours.

My mother did not feel that I needed to be present when she signed something. That's all I'm saying.

Q Okay.

And if you look at the first page of Exhibit 1, at the bottom there is a heading that says, Policy Summary.

Do you see that?

A Yes.

Q And the first sentence says, "This policy provides flexible premium adjustable life insurance to maturity date."

Do you see that?

A Yes.

Q What did you understand the maturity date to be?

A I did not understand it because this was not a page that I saw. Because

Page 26

G. Wiseman

as I said, I am very careful. If I had gotten it, I would have kept it. So I didn't see anything about maturity date. When I found out about the maturity date, I did something with my other policy.

Q When did you find out about maturity date?

A When I found out that my mother was paying $22,000 a year for her present insurance, which I was not aware of at that point yet, and that -- and then she needed to die by the time she was around 95, 96.

Q So you were not aware that her contract or your contract had a maturity date until two or three years ago?

A That's correct. It was late 2014. If I had been aware, I would not have been shocked to find that out.

Q And if you had had a copy of the contract, you would see the maturity date listed throughout the contract, right?

A Well, I see the word "maturity date."

Page 27

G. Wiseman

Q First page, second page, fourth page. If you would flip, Dr. Wiseman, to the back.

A It's interesting. You have --

MR. GOTTESMAN: Let him finish his question.

A Yes, I'm sorry.

Q Did you want to make an observation?

A No, it refers to age.

Q If you flip to the very back of Exhibit 1, Dr. Wiseman, the last three pages.

A Yes.

Q There is something that says Exhibit A, Comparison Statement at the top?

A Yes.

Q And kind of in the middle of the page there are two columns, one for Existing Life Insurance and one for Proposed Life Insurance.

Do you see that?

A Existing life insurance and

Page 28

G. Wiseman

proposed life insurance. Yes.

Q And if you look under each of those columns, you'll see a listing for "the age at which coverage ceases under the existing life insurance and under the proposed life insurance."

Do you see that?

Age 95 for both the existing and the proposed life insurance, right?

A Yes. Yes. And as I said, I did not see this, I didn't know this. Actually not even with mine.

Q If you look at the last page of Exhibit 1, Dr. Wiseman, is that your mother's signature on the last page?

A Yes.

Q And your mother there acknowledges that she received this comparison statement before applying for the new insurance?

A Yes and no. I'm sure she signed it because he asked her to sign it. Women are very different. She is a different generation.

Page 29

G. Wiseman

Q So she, at least, acknowledged that she received this document which indicated that in the new proposed life insurance policy, coverage would cease at age 95?

MR. GOTTESMAN: Objection. Hearsay. You can answer.

A I don't know what she was thinking at the time, but women change all the time. My mother had blind trust in this person, and he probably just told her to sign it and who knows what got filled in later. She didn't read it over carefully. Chances are it wasn't completed.

Q Why do you say that?

A Because she would have probably have had to run to his office in downtown Manhattan to sign it and then go back. I don't know if at the time she was still working or was just recently stopping to work.

Q You don't have any knowledge one way or the other about whether this was

Page 30

G. Wiseman

completed before she signed it, right?

A I have no knowledge of it yes or no. I don't think that she really would have left with full knowledge of a 95. Chances are she would have mentioned it. I don't know. I can't tell what she was thinking because I'm not her.

Q And so you don't know what her expectations were in buying this contract?

A I'm not her. I don't know, but I doubt her expectations were to have a cutoff at 95.

Q And why do you doubt that?

Is it because you always talked about whole life insurance?

A Because we spoke about whole life insurance. I mean -- and one would like to think that, you know, you would have it as long as you're alive.

Q I think you mentioned that Mr. Zucker was also a financial advisor to your mother. He did more than just sell this contract to her; is that right?

A Well, my understanding and,

Page 31

G. Wiseman

again, that's my understanding and I'm not my mother, I guess he advised her for many years. She isn't -- at this point in time she wouldn't have been cynical or questioning. She's grown up since then.

Q So you think she should have questioned Mr. Zucker?

A I believe this whole thing occurred because she didn't question.

Q In the middle of the last page of Exhibit 1 -- you're on the right page.

There is a number 5. It says, "The primary reason for the proposed replacement of the existing life insurance by new insurance is as follows:"

Can you read the handwriting there?

A "Lower cost, higher values".

Q Was that your understanding as to why your mother was replacing her existing life insurance with the Lincoln contract?

A I didn't question my mother as to why she was doing it, whether she was

Page 32

G. Wiseman

increasing her insurance, switching it.

My mother listened to Murray Zucker and, you know, I learned whatever I did along the way. But my mother is very trusting. I used to be too. I don't know what she was thinking at the time. But I do know, just I know her, she is very trusting.

Q And so you don't -- I think you've already said you don't know what her expectations were when she bought this contract?

A She probably assumed it was whole life and that this contract would cost her less and give her more money.

Q When you say she probably assumed that, do you know what she assumed?

A I have no way of knowing. But it says, "Lower cost, higher values". Chances are, it will be easy to tell her, listen, I have this other policy, same company but it is going to cost you less and you'll get more insurance. And she

Page 33

G. Wiseman

would have assumed that it was whole life, that she didn't have to die on a certain date.

Q You said she would assume that.

Do you know what she assumed?

A I have no way of assuming what she knew.

Q Or of knowing what she assumed?

A Yes, but I asked her if she knew about the cutoff date, and she told me many times that she did not.

Q Who has paid the premiums on the policy on your mother?

A My mother did. And as she got older and then she told me how much and that she was struggling, then I helped her.

Q So she paid the premiums at least until the premiums went up substantially?

A With the $22,000 she was struggling and she was scratching to pay it. And then I tried to help her with what I can and look at stuff I could sell

Page 34

G. Wiseman

so we could pay it.

Q How much did you personally pay in premiums on this contract?

A I don't remember. I know that as much as I can I give my mother money, but it varies all the time of what is necessary.

Q Can you give me an estimate of what the amount of premiums that you have paid on this contract?

A I probably gave her the money since I found out about the amount. It may have been around 2014 or late 2014 and onward.

Q That you paid how much?

A Whatever I could to help her, the full 22 or close to it. Hand over to her as much as I could in different ways.

Q How much though is what I'm trying to get at?

A I don't know. It could be all of it.

Q Or almost none of it?

A No.

Page 35

G. Wiseman

Q Was it always at least half?

A It's hard to tell because I had -- I was involved with so much of my stuff at the time, so I was trying to look for what could be sold and given to her that she could cover the costs.

Q And do you know how much?

A It would have been enough for the whole thing but the question is, did she spend something, a part of it on something else? I don't know.

Chances are it was the whole thing. The whole idea was to give her the money to pay the whole thing and whatever else she needed. So it was that and more.

Q So she continued to pay it but you gave her money so that she could pay for insurance and other costs that she has?

A Yes. I didn't want her to have somebody else sign off for her.

Q Did you become the owner of Exhibit 1 at some point in time?

A I guess.

Page 36

G. Wiseman

Q Do you know?

A I found out afterwards. I didn't know I was owner of the policy. It was a little bit of a surprise. I was like, oh, really. You mean mine? No.

Q So when did you find out you became the owner?

A Late 2014 when I started to help with it, and then I was looking at it and I was like, what do you mean I'm the owner?

Q Did you find out when you had become the owner?

I understand you found out in 2014 that you had become the owner, but did you find out at that time how long you had been the owner?

A I was afraid to ask.

What does being the owner entail?

THE WITNESS: I guess I should have asked you that.

BY MR. JOHNSON:

Q Unfortunately, the way this

Page 37

G. Wiseman

works is I'm the only one who gets to ask questions.

A I know. I'm sorry.

Q But you understand that you are the owner now?

A Yes, whatever that means; yes.

Q And do you know when you became the owner?

A No idea.

Q Do you know how you became the owner?

A No idea.

Q Did you ask Mr. Zucker how you became the owner?

A Probably, but he has no recall. If he has no recall, who is going to recall?

I don't know if it would had been that way all the way or some change was made because my mother was getting older. I have no idea.

Q Your mother didn't tell you that she had assigned the contract to you for ownership?

Page 38

G. Wiseman

A No.

Q And I'm not saying that she did, I don't know. That's what I'm trying to figure out.

A Same here.

Q You mentioned that you found out about the maturity date in this contract in late 2014.

How is it that you found out about the maturity date then?

A First I found out about the amount and then I was trying to figure out how you went from 4,000 suddenly to 22,000 since at least 2013.

Then I assumed it went until the end of time. And then I don't like to think of somebody dying on a certain date. And then at some point I saw a letter from Voya. Because I don't open her mail. We're very good about not opening each other's mail. And I saw something about a maturity date. And then I tried to ask her and I started making phone calls to find out what was meant by maturity date

Page 39

G. Wiseman

and when.

Q Was the letter about maturity date addressed to your mother or to you?

A I believe to my mother.

Q And was one of the phone calls you made to Mr. Zucker?

A Yes, initially it was to Mr. Zucker and then later to the company.

Mr. Zucker and I had spoken about my wish to then exchange the policy of her needing to die.

Q So you found out about the maturity date and your first call was to Mr. Zucker?

A Well, I had asked Mr. Zucker and then I tried to find out from Voya/ReliaStar.

Q When you spoke to Mr. Zucker, and this would be late 2014, early 2015, how long had it been since you had spoken to him prior to that point in time?

A We don't speak that often. He speaks to my mother. He is not exactly a spring chicken. He is not youthful. He

Page 40

G. Wiseman

has his own issues. His wife has issues. So we don't speak that often and --

Q It had been years since you spoke to Mr. Zucker; is that fair?

A No, we speak intermittently but we speak on social occasions. It's not like you're at a wedding or something and it's not like, okay, let's speak about this. Plus, by now I believe he is in a wheelchair -- certainly his wife is -- and intermittently or totally he might be by now too.

Q What did Mr. Zucker say to you when you called him to ask him about the maturity date.

MR. GOTTESMAN: Objection. Hearsay. You can answer.

A He said that he knows that there is a clause in the policy where it could be exchanged. And then I should try to exchange it.

His words were, you probably need to get a lawyer because I wasn't able to exchange it on my own.

Page 41

G. Wiseman

Q So he had tried to exchange it for you already?

A That actually would be guessing but that was my understanding. He might have. So then I just tried on my own to speak to Voya and ReliaStar and see where I could get on my own.

Q Back in the 1990s when you and your mother each purchased ReliaStar policies, did you ask any questions about what policies were available at that point in time to exchange into?

A When it was being bought for me?

Q Correct.

A Well, I was hoping it was whole life. It would be exchanged for another whole life. I certainly would not have been interested in term. I have walked away from too many of them through work. And I would want something that rolled over with me.

Q Did you ask Mr. Zucker when you were purchasing your contract what other contracts the company had that you could

Page 42

G. Wiseman

exchange into at some point in the future?

A He said that there were other whole life, you know, that they promised whole life so there had to be other whole life policies. And reassured me that, you know, that that was the promise, that it could be exchanged. And until we were actually dealing with it, so, like, don't worry about it.

Q It's hypothetical until you want to exchange, right?

A Right. Because basically things change over the years, everything is getting better, there will be more time even, it's getting better.

Q But you talked about the exchange, right, when you purchased your contract?

A Well, I was hoping it was what I wanted. I didn't know there would be issues. He just said if there were issues that it could be exchanged.

So if I didn't know there were issues, why would I be discussing

Page 43

G. Wiseman

exchanges if I didn't know there were issues?

Q The question was: Did you discuss the exchange provision when you purchased the contract?

A Absolutely. Because this was a problem that I wanted to know I could exchange it.

Q And Mr. Zucker assured you that there would be a whole life policy available for you to exchange to?

A He said that is what they write in their policy. He didn't show me mine but he showed me a sample, but that is what they write.

Q What did he say; that they would have a contract available?

A Yes.

Q And do you know whether your mother had any conversation with Mr. Zucker about the exchange provision when she purchased her contract?

A Yes, because we had discussed it that it had to be something worthwhile.

Page 44

G. Wiseman

Q So you recall over 25 years ago you and your mother discussing the exchange provision in her contract in connection with her decision to purchase it?

A I know I discussed it with mine. And I know that I had a discussion with her about this not only because it was 25 years ago, because, as I said, I walked away and left -- lost term insurances.

And then one of the hospitals I was working at was offering something that is like whole life, and I looked into it, et cetera and I bought it. And then I contacted the one who sold it to that hospital later because initially she thought she couldn't roll it over, turned out you could.

And because of the question at the time, I made a big deal of the fact that it needed to be whole life and it could be rolled over and it could be exchanged, because I thought I lost the John Hancock one.

Page 45

G. Wiseman

Q So I just want to understand. When your mother was looking at purchasing a policy --

A I told her about my experience.

Q And that she should make sure --

A And made a strong recommendation that if she were ever to change it, she should stick to whole life and exchange if there are issues that we don't foresee.

MR. JOHNSON: We've been going about an hour. Why don't we take a short break.

Let's go off the record.

(Thereupon, a recess was taken, and then the proceedings continued as follows:)

BY MR. JOHNSON:

Q Dr. Wiseman, do you have any reason to believe that what we have marked as Exhibit 1 is not the contract that you owned with ReliaStar on your mother's life?

A I have no way of telling because like I said, I only quickly saw a sample.

Page 46

G. Wiseman

I didn't see one that was mine. I didn't see one that was my mother's. And I feel very bad about it that I don't have it, and I was always so busy.

Q So if I understand your testimony, you believe that when you purchased your contract, you saw a sample contract that Mr. Zucker showed you?

A I believe so.

Q And that thereafter you never had possession of a copy of your contract until --

A I assume that he may have given it to my mother because at the time I was always at work.

Q So you assumed that Mr. Zucker gave your contract to your mother?

A But apparently that's not the case, but I did assume it.

MR. JOHNSON: Let's mark this as Exhibit 2, if we could.

(Whereupon, Service Information Report from ING for Gloria D. Wiseman, was marked as Defendants' Exhibit 2

Page 47

G. Wiseman

for identification, as of this date.)

THE WITNESS: You get the original.

BY MR. JOHNSON:

Q You actually get the original. You're the guest of Honor.

A This is to Mrs. Wiseman, meaning my mother.

Q That was going to be my question. You're reading my mind.

I was going to chastise them for not calling you "Doctor".

You are a doctor, aren't you?

A Yes.

Q So this is to your mother?

A I don't know because apparently not. One ends with "E" and one ends with "G".

Q And one has -- had a $300,000 death benefit and one has a $500,000 death benefit?

A Yes.

Q Whose telephone number and fax number is on page 1?

Page 48

G. Wiseman

A Mine.

Q This is from 2010.

Did your mother live with you at that point in time?

A No, I lived in New Jersey.

Q And that's the 201 area code?

A Correct.

I'm just not used to seeing my name as Mrs. Wiseman.

Q Understood.

A I mean, that's my maiden name.

Q I'm sorry, you said that's your maiden name?

A Yes, Wiseman is my maiden name.

Q What other names have you had?

A When I was married I was Wiseman-Hirschprung, H-I-R-S-C-H-P-R-U-N-G.

When I got divorced I left -- I legally took off the Hirschprung.

Q When was that?

A February 23, 2011. But as a physician, I always worked as Wiseman, so there was no name change there.

Page 49

G. Wiseman
Q Do you still work as a physician?
A Yes.
Q Why was this service information report sent to you in 2010?
A May I ask a question?
Q Certainly.
A What is LW&T?
Q I think that stands for last will and trust, but I don't know.
I'll repeat the question.
Why was this document, Exhibit 2, sent to you in June of 2010?
A I don't know. It may have been because I was separated and I was trying to check everything. I didn't know it had to be given. I have no idea. I have no idea.
Q That's okay. It's a fine answer.
Dr. Wiseman, if you look back at Exhibit 1, let's talk about the exchange provision. Flip with me, there is a lot of pages, I know, but if we flip together

Page 50

G. Wiseman
we can stay together.
Let's start at the beginning, first page.
MR. GOTTESMAN: Would it be okay if I help her?
MR. JOHNSON: Sure.
Q Flip page 2, 3, 4, 5, 6, 7 -- we're actually not going to start on the exchange provision. There is a couple of other things I wanted to focus on first.
Let's look at this page, Guaranteed Paid-Up Insurance Option.
MR. GOTTESMAN: It's okay. I'm going to find it for her.
MR. JOHNSON: Please. Thanks.
BY MR. JOHNSON:
Q Dr. Wiseman, what is the Guaranteed Paid-Up Insurance Option that is contained in your mother's contract?
A I'm unclear. Is this mine or my mother's?
Q This is your mother's contract.
Well, I should say it is the contract on your mother's life that your

Page 51

G. Wiseman
mother was the original owner of.
A This is -- oh, this is my mother's. Oh, okay. Oh, yes, the other sheet --
Q I'm sorry, what?
A This sheet was mine. Okay, fine.
Could you repeat the question, please?
Q Sure.
What is the Guaranteed Paid-Up Insurance Option that's included in Exhibit 1, the contract at issue here?
MR. GOTTESMAN: Objection. The document speaks for itself. You can answer.
A Which line are you talking about, the third line?
Q I guess let me just back up.
What do you understand guaranteed paid up insurance to mean?
A Are you talking about guaranteed paid up not cash surrender?
Q I'm talking about -- what is

Page 52

G. Wiseman
your understanding of the phrase guaranteed paid up insurance?
A I honestly don't know. I can hazard a guess. Where they talk about whole life insurance premium calculation and insured's birthday. Is it what you pay every year?
Q Isn't paid up insurance the same as whole life insurance?
A I don't know.
Q Let's look at the exchange provision, if we could.
MR. GOTTESMAN: Is it okay if I show her?
MR. JOHNSON: Please. Thanks.
A Yes.
Q The exchange provision begins, "You may exchange this policy for a new policy. Such exchange may be to any plan, whole life or endowment that we issue at the time of exchange".
Do you see that? And it continues.
A Yes.

G. Wiseman

Q I believe it was your testimony that Mr. Zucker assured you that there would be a whole life endowment plan available at the time of exchange?
A Yes.
Q Does the contract guarantee that there will be one available?
MR. GOTTESMAN: Objection. The deponent is not an attorney.
You can answer the question.
A Well, please excuse my ignorance, but it appears that my understanding is that it would be exchanged for whole life.
This is being called a flexible premium adjustable life insurance, except that it is not that. It is for, I assume, whole life. And then you're calling it at one point that this is a whole life versus it is not a whole life?
Q I'm not calling it anything. I'm just asking you questions.
A Well, I'm confused.
MR. GOTTESMAN: You can ask --

G. Wiseman

can you go back and read back the question or ask it again?
Just listen to the question and answer the question.
THE WITNESS: Yes.
BY MR. JOHNSON:
Q Does this provision guarantee that there will be a plan of whole life insurance or endowment available from Lincoln at the time of request an exchange is made?
MR. GOTTESMAN: The deponent is neither an attorney or an insurance expert.
You can answer the question.
A It says, "You may exchange this policy for a new policy. Such an exchange may be to any plan of whole life or endowment".
Q "That we issue at the time of exchange," right?
A Yes.
Q Is that a guarantee that they will have one available to issue at the

G. Wiseman

time an exchange request is made?
MR. GOTTESMAN: Objection. The deponent is neither an attorney nor insurance expert.
You can answer the question.
MR. JOHNSON: I'll withdraw.
A My understanding -- I'm not, like you said, an attorney or an insurance broker. But my understanding is that if you sell something and you promise something, you make good on what the deal was at the time. That always has been what I did. That is what I do with the parents of my patients.
Q And you understood the deal at the time was that you were buying the whole life insurance contract, and that you would be able to exchange to a whole life insurance contract because Mr. Zucker told you that, right?
A Yes, and he indicated it was guaranteed in the policy.
Q That there would have something available to exchange to?

G. Wiseman

A Yes.
Q And it says if you read further down, Dr. Wiseman, towards the bottom of the exchange provision it says, "We will calculate the premium for the new policy according to the rates in effect for the age and premium rate class of the insured at the time of exchange."
Do you see that?
A Yes.
Q And approximately how old was your mother when you first tried to exchange this contract?
A Well --
Q Was she about 93 or 4?
A She was about 93. But may I point out that if we had known when she was younger, we would have tried earlier.
Unfortunately, 93 was when I found out. If we had known all of those years ago, A, we wouldn't have bought it, and, B, it would have been exchanged a lot earlier.
Q And you would have known a lot

G. Wiseman

earlier if you had a copy of your contract, right?

A Yes.

Q And although you now know about the maturity date, you haven't exchanged your contract?

A Yes, because that's true, but not because I don't intend to. What I do will ride on what happens with my mother's.

Q We looked at the sentence that says, "We will calculate the premium for the new policy according to the rates in effect for the age, the premium rate class of the insured at the time of exchange"?

A Uh-huh.

MR. GOTTESMAN: You have to answer orally.

A I'm sorry.

Q Can you --

MR. GOTTESMAN: Can you ask the question again?

BY MR. JOHNSON:

Q We looked at the provision that

G. Wiseman

says, "We will calculate the premium for the new policy according to the rates in effect for the age and premium rate class of the insured at the time of exchange," right?

A Uh-huh.

MR. GOTTESMAN: Again, one more time, you have to answer orally; "yes" or "no".

A Are you talking about me or my mother?

Q I'm just asking whether you see that provision in this contract?

A Yes, I do.

Q And I believe you testified already that your mother's premium had grown from $4,000 a year to $22,000, correct?

A Yes.

Q Do you have any understanding as to why her premium had increased like that?

A Well, the indication would be that it had increased due to her age. She

G. Wiseman

is healthy.

Q But --

A But it is a huge jump from 4 to 22,000.

Q Sure.

And you would agree with me that the cost of insurance for someone in their 90s is more expensive than for someone than his or her 70's.

MR. GOTTESMAN: Objection. The deponent is not an insurance expert. You can answer the question.

A I don't know what the cost of insuring is. Unfortunately, I look at it as you guys are collecting a whole bunch of money.

Q Do you think it is that simple?

A Well, it seems rather simple. You're collecting the money and people pay in every year or every couple of months in the hopes that, like as advertised on the TV, I see all the time, if I ever get to turn on the news, you see -- I understand so and so has died, but I have a really

G. Wiseman

good policy and the rates don't ever change, and we're going to have money, unlike so and so who died without an insurance policy.

If we do this, we're going to have money for burial and funeral and so we don't have a difficult time afterwards. And then this actor comes on and recommends it, others come on and that's really how people talk.

The expectation is you get life insurance to try to provide and save those that are left behind from a lot of problems.

Q So your expectations about what you're entitled to under this contract are informed by television ads that you have seen from other insurance companies?

A That and, unfortunately, life experience has taught me it may not quite be that way, but the reality is that on the advertisements for insurance they don't get up and say we want to insure you young and collect all the money and hope

Page 61

G. Wiseman

that we never pay out, or whatever.

I don't know. I mean, the expectation is that you put in the money to help with what gets paid out for you and that you have some sort of money put aside.

Q That's your expectation, right?

A Yes, the expectation is that that is not the case, then why buy life insurance? Why don't you just sock it away, invest it and sock it away?

Q If your mother had died at age 72, two years from this contract, what do you think would have happened?

Do you have any reason to believe that ReliaStar would not have paid you $300,000, despite having only received $4,000 in premium?

A One would like to think so, but I don't like to think of the fact of her dying at such a young age. That is a difficult issue.

Q You did ultimately make a request in writing to exchange to a new

Page 62

G. Wiseman

policy, didn't you?

A Yes, for my mother, yes. As I said, I intended for myself but whether I -- I felt that whatever happens here would affect my policy.

MR. JOHNSON: Let's mark this as Exhibit 3, if we could.

(Whereupon, Letter from Gloria Wiseman to Angela LeClair-Cardinal at Voya, was marked as Defendants' Exhibit 3 for identification, as of this date.)

BY MR. JOHNSON:

Q Dr. Wiseman, can you identify Exhibit 3 for us?

A Yes.

Q What is it?

A It's a letter that I wrote to Angela Cardinal, but I aimed it at her as well as Voya staff members because I didn't know who I would end up with, if it would stay her.

I had many questions and I wanted to give notice, which I believe I

Page 63

G. Wiseman

already had, to someone else before.

Aside from verbally, I kept on mentioning it and then realized I really needed to put it in writing. I believe I put it in writing for her, but okay.

Q And this is dated February 20, 2015?

A Yes.

Q You have got three numbered paragraphs in your letter.

Do you see that?

A Yes.

Q In paragraph number three you say, "Your proposal appears to be contrary to the terms in Mrs. Olga Wiseman's policy".

Do you see that?

A Yes.

Q What proposal are you referring to there?

A It could not be exchanged.

Q So the company's proposal is that it could not be exchanged?

A Yes, just a flat no. And every

Page 64

G. Wiseman

time I called I spoke to different people, yes.

Q Did you type this letter out?

A Yes.

Q Did anyone review it for you?

A No. Should they have?

MR. GOTTESMAN: He is going to ask the questions.

Q When we're done, we can have a dialogue.

A Okay. Sorry.

Q You say towards the end of paragraph three, Dr. Wiseman, you write, "As I mentioned, my mother has a whole life policy".

Do you see that?

A Yes.

Q That wasn't correct, was it?

A I did not know that.

Q So as of February 2015, you thought she still had a whole life policy, right?

A Unfortunately, yes.

Q And at that point in time you

Page 65

G. Wiseman

had already received a copy of her contract, hadn't you?

A Yes, but if you look at it, there are places where it appears to describe itself as whole life.

Q Show me where in Exhibit 1?

A There is something that we looked at. Yes, it called itself flexible whatever. But there was something we went to the point -- and I don't remember where they were at writing --

Q Sure. I'll tell you what that is. That was the guaranteed paid up provision, is that what you're talking about?

A Possibly. And it could be somewhere else.

MR. GOTTESMAN: Would I be able to help her?

MR. JOHNSON: Sure.

THE WITNESS: Please.

BY MR. JOHNSON:

Q Dr. Wiseman, we flipped to within Exhibit 1, a provision that we

Page 66

G. Wiseman

looked at a few minutes ago called the Guaranteed Paid-Up Insurance Option.

Is this what you're referring to in relation to this contract being a whole life contract?

A It's possible somewhere else as well, but this is one of it.

Q Did you or your mother ever complete the bottom of this page, the request for guaranteed paid up insurance?

A By the time we got it, we were writing to ask for an exchange. I was dealing with human beings, I thought.

Q So you had a copy of the contract when you wrote the letter that we looked at as Exhibit 3?

A My mother had it.

Q And it was your understanding that it was still at that point in time a whole life policy?

And your letter says, "My mother had a whole life policy," right?

A Yes.

Q If you look at a line above

Page 67

G. Wiseman

that, Dr. Wiseman, you have a quote from the contract.

Do you see that?

A Yes.

Q And doesn't that quote omit a few words?

MR. GOTTESMAN: May I help her?

MR. JOHNSON: Sure.

Q Doesn't that sentence that you quote include the provision that we issue at the time of exchange?

A Well, the one that arrived was in my mother's home. We don't live together. I read it. I made notes. And then if it was an e-mail, then I wrote from a computer, which is not in her house.

My take away from it is that it can be exchanged for a whole life plan.

Q Regardless of whether the company issued one of those at the time of the request for an exchange?

A It appears so, but in the process of being sold, it was that it

Page 68

G. Wiseman

would be the whole life plan. And, furthermore, in the conversations that I had with Yvette, and I'm not sure of her last name, she appeared to indicate that it was exchangeable.

MR. JOHNSON: Can I have that answer back, please?

(Record read)

BY MR. JOHNSON:

Q Dr. Wiseman, you have talked about the process of this contract being sold. That's Mr. Zucker selling this contract?

A Yes. Yvette was later. That was from a company years later.

Q And so Mr. Zucker is the one that represented there would be a whole life policy available to you for exchange?

A Yes.

Q In your letter, Exhibit 3, the last sentence of paragraph 3 you write, "I am giving you written notice that we wish to exchange this policy for a similar policy with no age expiration, same

Page 69

G. Wiseman

premiums or less".

Do you see that?

A Yes.

Q Were you entitled to a similar policy with no age expiration, same premiums or less?

MR. GOTTESMAN: Objection. The deponent is neither an attorney or insurance agent.

You can answer.

A I believe so. I did that with John Hancock.

Q So why do you believe that you're entitled to a similar policy with no age expiration, same premiums or less?

A Well, it was my belief and hope for many years that it really was whole life. And as I said, I did exchange the John Hancock policy for another policy for actually increased amount and less premiums, and I don't have to drop dead at 95.

Q When you say a similar policy in your letter, do you mean a similar death

Page 70

G. Wiseman

benefit, $300,000?

A Yes.

Q The John Hancock policy that you have talked about, you were paying $12,000 a year in premiums for over 20 years?

A Yes.

Q And you started paying those premiums when you were in your 30s?

A Yes.

Q When you exchanged your John Hancock contract --

A It was for 1.4 million.

Q What was the existing cash value of the contract at the time that you exchanged it, the John Hancock contract?

A I don't know. There was money in it. I don't have the exact number.

Q But the reason you think that you were entitled to exchange your mother's contract for another $300,000 contract with no age expiration and no premium increase is because of your experience in exchanging your John Hancock contract?

Page 71

G. Wiseman

A Yes.

Q And had you exchanged the John Hancock contract by this point?

A I don't recall the timing but I might have been in the process or we were working on it or it was. I don't recall.

Q Have you looked into buying a whole life policy on your mother from another company?

A No.

Q So you have no idea what, if you were to go to, say, Northwestern Mutual and ask them for a whole life policy on your mother right now, what the premium charge would be?

A No, the issue is that to start now would be much more difficult. I'm dealing with expectation of what would happen considering the fact that we're going back to 1991.

Q What was the cash value of your mother's contract on the day of maturity?

A I don't recall.

Q Was it about $174. Does that

Page 72

G. Wiseman

sound right?

A No.

Q What do you think --

A But I'll take your word for it.

Q What sounds right?

A I thought I saw somewhere like 16,000; $37,000, 16,000. I don't know. That's also not a large amount, but 174 is a little surprising. I don't understand how it tranned to $174.

Q Do you know what a premium and cash value are applied to in the operation of a universal life insurance policy?

MR. GOTTESMAN: Objection. The deponent is neither an attorney or life insurance expert.

A I don't know.

Q Do you know whether there is any company issuing life insurance contracts -- excuse me, whole life insurance contracts on individuals over the age of 90?

A I have no way of knowing. I wouldn't have started to look right now

Page 73

G. Wiseman
because it is a little bit late.
Q Well, your mother is still alive, isn't she?
A Yes, but she hasn't gotten any younger, and it might be difficult now. But like I said, I don't buy and sell insurance. I don't know. My guess is it would be very expensive now.
Q You mentioned Bruce Agee -- is that how you say his name -- the John Hancock agent?
A Yes.
Q Do you e-mail with Mr. Agee?
A Why?
Q I just want to know how you communicate with him.
MR. GOTTESMAN: Answer the question.
A He came to my house. We had meetings.
Q Have you spoken to him on the telephone?
A Yes.
Q And have you e-mailed with him,

Page 74

G. Wiseman
you sent him an e-mail message or has he sent you one?
A Quite possibly.
Q What is your e-mail address right now?
A The one at Columbia or my private one?
Q Do you use your work e-mail address for personal matters?
A No, but I have no idea where this is going.
Q I'm just asking questions.
MR. GOTTESMAN: Answer the question.
Q So you don't use your work e-mail for any personal matters?
A I try not to.
Q So you would use your -- if you had e-mail with Mr. Agee, you think it would be from your personal e-mail account?
A Yes.
Q What is that e-mail address?
A G.D.WISEMAN@ATT.NET.

Page 75

G. Wiseman
Q And have you had any other personal e-mail addresses over the past five or six years?
A With Verizon, but not much with Verizon.
Q When did you stop using your Verizon account?
A When they stopped having one, which was probably in the last year or two.
Q What was your Verizon e-mail address?
A GD.Wiseman@Verizon.net.
Q Do you text message with Mr. Agee at all?
A No, I don't tend to like texting.
Q Are you on Facebook or any social media?
A No.
Q Do you know whether Mr. Agee worked for Mr. Hancock or just an independent insurance agent?
Do you know?

Page 76

G. Wiseman
A I don't know exactly. I got the referral through John Hancock. My guess is he might be independent.
Q And Mr. Zucker is independent as well?
A Yes.
Q Who is, and I may not say this name right, Kenneth Pinczower?
A Pinczower.
Q Who is that?
A He is a lawyer who happens to be one of my cousin's husband. My first cousin's husband.
Q Is that P-I-N-C-Z-O-W-E-R?
A Yes.
Q Is he your lawyer in this lawsuit?
A He was. He was a lawyer that I went to to ask some questions about where I proceed from here.
Q And that's because he is related to you in some fashion?
A He is Julie's husband.
Q Julie is your cousin?

Page 77

G. Wiseman

A Yes. The intention was to figure out how to resolve this initially without litigation.

Q Did you authorize Mr. Agee to contact ReliaStar on your behalf?

A Yes, I did.

Q Why did you do that?

A Because I was trying to resolve the issue. I didn't understand what was going on. He dealt with insurance companies and I thought maybe he could find out more or have another suggestion.

Q Did he reach out to ReliaStar on your behalf?

A I believe he did.

Q Why do you believe that?

A I have no way of knowing. I'm not him. I believe he did. My understanding from him is that he was not successful.

Q He was not successful in reaching out to ReliaStar?

Let's back up. What did he say to you?

Page 78

G. Wiseman

MR. GOTTESMAN: Objection. Calls for hearsay.

You can answer.

A His impression was that he did not hold out hope for exchanging the policy, that you guys were refusing to exchange the policy.

Q Did he offer any other solutions?

A No. Because I'm a single mother, went through a really nasty divorce. I help my mother as much as I can. I have a lot of expenses and I don't have a huge amount of money to put out into other policies. The time would have been a lot earlier.

Q So if you had had a copy of your contract and known about the maturity date, you would have acted a lot quicker?

A I was single and I had money. Now I don't.

Q Did you end up contacting the New York Department of Financial Services about your frustrations?

Page 79

G. Wiseman

A Yes.

Q And what was the response you received?

A If I remember correctly, I believe they felt that business was business. That you don't have to keep your word.

Q Did you receive a response, a written response, from the Department of Financial Services?

A I don't know. It might have been an e-mail. I don't recall. I know that I don't think I have it. I'm sure you guys can get hold of whatever you want.

MR. JOHNSON: Let's mark this as Exhibit number 4.

(Whereupon, Letter to Department of Financial Services dated December 22, 2015, was marked as Defendants' Exhibit 4 for identification, as of this date.)

BY MR. JOHNSON:

Q Dr. Wiseman, can you identify

Page 80

G. Wiseman

Exhibit number 4 for us?

A Yes. This is a letter that I sent to the Department of Financial Services.

Q You say in your second or third sentence in your letter, Dr. Wiseman, you write, "My mother, Mrs. Olga Wiseman, born April 26, 1921, took out a life insurance policy years ago wanting it to be a permanent insurance. She was assured, when it was sold to her that it was permanent, whole life insurance".

Do you see that?

A Yes.

Q Have we already covered today the basis for your understanding that she wanted to buy a permanent insurance policy.

Let me -- I'll just ask the question to try and save time.

A All right.

Q Is the basis for your statement in your letter that your mother was wanting permanent insurance that your

Page 81

G. Wiseman

mother and you discussed when she was buying this policy that she should buy whole or permanent insurance?

A Yes.

Q And you write that she was assured when it was sold to her that it was permanent whole life insurance, those are assurances from Mr. Zucker?

A And she thought based on what she was signing.

Q Now, we saw based on what she signed that the coverage was going to end at age 95, right?

A Well, obviously, she didn't notice that part, as neither did I.

Q Did anyone other than Mr. Zucker make any assurance to your mother about the nature of the life insurance that she was buying?

A I would have no way of knowing.

Q And you say a few sentences down in the letter, "She would not have bought it if it were term or anything less than permanent whole life, regardless of age".

Page 82

G. Wiseman

Do you see that?

A Yes.

Q Why do you say that?

A Because she would not have bought it. She also worked and I don't know if she would have had life insurance through a company or not, but term comes and goes.

I know with my life, term comes and goes. And you walk away a lot of times leaving your life insurance and other benefits behind.

Q You pay a lot less for term insurance too, right?

A Yes, it is probably why employers offer it. But I have two children and I am an old mother to young children. I have to provide for them. They have to continue through life. They are just starting high school. They have to get through high school, a religious private high school and then college and then train in whatever post graduate they choose.

Page 83

G. Wiseman

It is a lot of years, a lot of money. And if they are on their own, I would like to leave something behind for them. Their father is not going to help them. He pays nothing.

Q The question was simply whether term insurance was less expensive than whole life insurance?

A A long irrelevant answer.

MR. JOHNSON: Why don't we take a short break.

Let's go off the record.

(Thereupon, a recess was taken, and then the proceedings continued as follows:)

BY MR. JOHNSON:

Q Dr. Wiseman, we were looking at Exhibit 4 before the break, and I still have a few more questions.

A Okay.

Q If you would look on page 2 of your letter about a third of the way down you write, "Voya claims they have no such policy to exchange it to, and even if it

Page 84

G. Wiseman

were true -- if it were to be true, which is doubtful, ING slash -- actually, it's just ING ReliaStar -- does".

A I think it should have been a slash.

Q It doesn't matter for purposes of this question.

What is your basis for that statement?

A I was told -- I'm trying to remember my sources, but I was told that they did.

Q You were told that the -- which is they, Voya or ING or ReliaStar?

A I was told that definitely ING and ReliaStar did have other such policies.

Q That you could exchange to?

A Right.

Q And who told you that?

A I'm trying to remember. I know I definitely heard it. I am -- it could have been Murray Zucker. There is a possibility of Bruce Agee. But I believe

Page 85

G. Wiseman

in one of my phone calls to Voya, Yvette may have let that fall as well.

Q Let it fall that --

A She was very hopeful I should be able to exchange it and they had with what. Like a policy that could be used.

Q And you continue on in your letter that -- you write, "I, like my mother, bought a policy" -- and I won't read the number here -- "from Lincoln, later ING ReliaStar and now Voya with intention to buy permanent whole life insurance" -- excuse me -- "to buy a permanent whole life policy and was misled as well".

Who did you tell that it was your intention to buy a permanent whole life policy?

A Who did I tell?

Q That is a poor question.

When you bought your Lincoln policy, did you tell Mr. Zucker that you wanted a permanent whole life policy?

A Yes.

Page 86

G. Wiseman

Q Did you tell anybody else besides Mr. Zucker that you wanted -- that it was your intent to buy a permanent whole life policy?

A My mother, Murray Zucker was arranging it. Many years later Bruce Agee would have known. That was not the time.

Q Anyone at Lincoln?

A I was not an insurance agent. I was buying from an insurance agent that my mother and I thought understood what we wanted.

Q And you say you were misled as well. Who misled you?

A I wanted whole life. I didn't want like whole life. I didn't want to have dying at certain ages. And I ended up with, although he tried and did whatever, maybe he had a paternalistic approach. I don't know. I can't speak for him.

I was very trusting, as was my mother. I was also always very busy. I take care of premies in an ICU, so I was

Page 87

G. Wiseman

on call a lot. I worked all day almost every day and lots of nights. I love what I do, what I did, but I wanted to make sure my future children would have a life. I always wanted children.

Q So who misled you; was it anyone other than Mr. Zucker?

A I believe the companies involved did because I believe that Lincoln had it or whatever the time was willing to exchange it for a whole life, if that was not the case. And then it was bought by company after company who had no intention of upholding what was promised to policyholders. I think we were just numbers.

Q I think you just told me Yvette was hopeful that she could help you find an exchange?

A Yes, she was.

Q And she was with ReliaStar?

A Yes, or Voya or both. I have no idea.

MR. JOHNSON: Let's mark this as

Page 88

G. Wiseman

Exhibit 5.

(Whereupon, Contract from Lincoln Security Life Insurance Company, was marked as Defendants' Exhibit 5 for identification, as of this date.)

MR. GOTTESMAN: He will ask the questions and you answer the exact question.

BY MR. JOHNSON:

Q Was there something else you wanted to add though?

A No, I just don't know exactly who she was working for, and those people didn't say they were compliance or customer service or which company.

MR. GOTTESMAN: Let him ask a question.

BY MR. JOHNSON:

Q Do you know what Exhibit 5 is, Dr. Wiseman?

A No.

Q Have you ever seen Exhibit 5 before, putting aside the "Duplicate"

Page 89

G. Wiseman

stamp in the middle of it? This is two sided copying, as you can see. On the third piece of paper, do you see the policy data page?

Flip back several, one more page.

Just looking at the policy data, does that page refresh your memory that this is your Lincoln Security contract, Exhibit 5?

A No. As I said, I did not see mine.

Q So this, to your knowledge, is the first time you have ever seen your contract?

A I believe so. I believe I saw a sample.

Q But you understood when you purchased yours that it had the same terms as your mother's contract?

A I understood that it had the terms that I wanted.

Q What were those terms?

A Whole life. I had no knowledge

Page 90

G. Wiseman

of any cutoff date. I did not want it. We were focused on the whole life and --

Q So this contract that we're looking at has a maturity date of September 1, 2051.

Do you see that?

A Yes.

Q And you purchased it in August 1994?

A Uh-huh.

Q So it has a 57 year life span if the premiums are paid; is that right?

A Yes.

Q But if you had reviewed this contract, you would have rejected it because of the maturity date?

A Yes. I'm not God. I don't know how long people live, but I do know that before World War II grandparents, you know, were very old, et cetera, et cetera.

Q But it is your understanding that this contract is still in force?

A Yes, and as I said, I felt I cannot deal with it now because I need to

Page 91

G. Wiseman

see what happens with my mother's.

Q You mentioned that you believe Mr. Zucker told you when you were trying to exchange that Voya or ING or ReliaStar did, in fact, have something to exchange into; is that right?

A Yes.

Q Did they ultimately offer you something to exchange into?

A Ultimately?

Q At any point in time as the company after you requested an exchange proposed a new contract on your mother that would extend the death benefit past age 95?

A Unless it was something that was discussed with Mr. Gottesman, I don't know.

Q And you're right to note that discussions between you and Mr. Gottesman are off limits. I don't want to hear about any conversations the two of you had or the substance of those conversations.

MR. JOHNSON: Let's mark this as

Page 92

G. Wiseman

6.

(Whereupon, E-mail from Andrea Nelson to Mr. Gottesman, dated March 18, 2016, was marked as Defendants' Exhibit 6 for identification, as of this date.)

A This is addressed to Mr. Gottesman.

Q It is.

Exhibit 6 is an e-mail with an attachment from Andrea Nelson of Voya Financial to Mr. Gottesman.

Do you see that?

A Yes.

Q And Ms. Nelson says to Mr. Gottesman, "Attached is the illustration we discussed for the Duration Universal Life product. This represents what may be available, depending on the applicable state law and actual facts of Ms. Wiseman's current situation".

Do you see that?

A Yes.

Q And there is attached to it a

Page 93

G. Wiseman

Voya Duration Universal Life illustration.

MR. GOTTESMAN: I'm going to object to this whole line of questioning, as this was in the context of settlement negotiations, but you can answer the question.

BY MR. JOHNSON:

Q Do you see the attachment to this e-mail, the Voya Duration Universal Life illustration?

A No, but it may have been discussed.

Q But as you sit here today, you think this is the first time you have ever seen this document, the Voya Duration Universal Life illustration?

A Unless it was an attachment, I don't remember. I don't recall.

Q If you look at the page numbering in the upper right-hand corner of this document, I'm looking at page 6 of 10. And in the middle there, there is a table of numbers. And to the right there is -- in fact, to the far right of the

Page 94

G. Wiseman

column it says, "Net death benefits" and the valuation each of those is $300,000 through age 100.

A Yes.

Q And so this illustration depicts a scenario where you could have $300,000 in death benefit through age 100.

Do you see that?

A It seems to cutoff after 96. If you're looking at where there is three stars, there is 000.

Q That is under the minimum interest rate and maximum charge scenario.

If you go to the far right of the current charges at four and a half percent rate, do you see that this illustration provides for $300,000 of insurance death benefit through age 100?

A Yes.

Q And the premiums are 71,000 in the first year and 56,840 in the subsequent years?

A Yes.

Q Were you interested in paying

Page 95

G. Wiseman

that amount of premium to extend the death benefit on your mother?

A I would be unable to do so.

Q So you would not have wanted to exchange into a contract that provided for $300,000 in death benefit, if the premium was going to be $56,000 a year?

A Could you repeat what the premium would have been? You said 56 --

Q Yeah, and we can be more precise or we could use the first year of 71,000.

A Right.

Q And the difference between the 71,000 and the 56,000 was the cash surrender value of the contract at the time of the illustration?

A Yes. And the reason why is because I'm paying in premium as much as she's getting as a net benefit. And that goes back to my comment that they may as well sock it in a bank and not buy life insurance.

Q If you had purchased this and paid out $71,000 in year one and your

Page 96

G. Wiseman

mother passed, she would have been paid $300,000, right?

A Yes, but I'm counting on my mother continuing to live.

Q Then why do you buy any insurance on her at all?

A Unfortunately, one doesn't always get what one wants. She may eventually, God forbid, die. I don't know. There is always hope to survive.

MR. GOTTESMAN: Would it be okay if I clean up her exhibits?

MR. JOHNSON: That is a great idea.

BY MR. JOHNSON:

Q Dr. Wiseman, it's almost one o'clock. If you want to take a lunch break, we can. I guess I have about another hour to go.

A What do you want to do?

MR. GOTTESMAN: It's totally up to you. If we continue now, we will be done --

MR. JOHNSON: Around two

Page 97

G. Wiseman

o'clock.

Let's take a short break.

(Thereupon, a recess was taken, and then the proceedings continued as follows:)

BY MR. JOHNSON:

Q Dr. Wiseman, before the break, we were talking about opportunities to exchange your mother's contract for one that would extend the death benefit beyond age 95. And we looked at, I guess it was Exhibit 6 that --

A Is that this one? The last one?

Q Yes.

Were there any other opportunities presented to exchange besides what's suggested in Exhibit 6?

A I'm not sure if there was another instance or if I'm confusing the other instance with this.

Q But you think there was one other instance?

A It is possible. I don't know. This may be it. I think I only know one

Page 98

G. Wiseman

and I thought this was it, but I don't know if this is different or the same thing.

MR. JOHNSON: Let's mark this as Exhibit 7, if we could.

(Whereupon, E-mail from Brian Mueller to Murray Zucker dated December 4, 2017, was marked as Defendants' Exhibit 7 for identification, as of this date.)

BY MR. JOHNSON:

Q Dr. Wiseman, have you ever seen the e-mail that's printed out in Exhibit 7?

A No.

Q And that's an e-mail from Brian Mueller or Mueller to Mr. Zucker.

Do you see that?

MR. GOTTESMAN: Objection. The document speaks for itself. You can answer.

A Well, that's what it says.

Q Is that Mr. Zucker's e-mail address there, the AOL address?

Page 99

G. Wiseman

A I wouldn't know because I never e-mail him.

Q And the subject line of the e-mail is "Wiseman policy".

Do you see that?

A Yes. I'm just taking a second to read it.

Q Take your time and let me know when you have had a chance to look through it.

(Witness reviewing document.)

Q Have you had a chance to read through it?

A Yes, I believe so.

Q If you look at the first line it says, "In response to your recent inquiry."

Were you aware that Mr. Zucker had inquired of the company concerning the contract at issue in this case?

A No, and I guess he may not have known about Mr. Gottesman.

Q Did you ask Mr. Zucker last fall or in late 2017 to reach out to --

Page 100

G. Wiseman

A No, I did not. Mr. Gottesman was retained.

Q So Mr. Zucker's activity here was unknown to you?

A That's correct.

Q And did Mr. Zucker provide to you any of the information that's in this e-mail, which is that there is a possible life insurance policy that would extend the death benefit?

A I'm sorry. No.

Q Mr. Zucker didn't tell you any of that?

A No.

(Whereupon, Voya Duration Universal Life Illustration, was marked as Defendants' Exhibit 8 for identification, as of this date.)

BY MR. JOHNSON:

Q Dr. Wiseman, take a minute to look through Exhibit 8.

The question I'll ask you after you have had a chance to look through it is whether you have had a chance to look

Page 101

G. Wiseman

through this document that we have marked as Exhibit 8.

Have you seen Exhibit 8 before, Dr. Wiseman?

A No. Does this have something to do with the other one?

MR. GOTTESMAN: He asks the questions.

A No, I haven't seen it.

Q You're always thinking two steps ahead of my next question.

So you don't know whether what we have marked as Exhibit 8 is an attachment to Exhibit 7; is that correct?

A That's correct.

Q I think it would be easier to look at Exhibit 7, which is just one page.

If Mr. Zucker had shared this information with you that's in Exhibit 7, would you have been interested in purchasing the policy described there with a premium of $66,000 a year.

MR. GOTTESMAN: Objection. This is a matter that was in the context of

Page 102

G. Wiseman

settlement negotiations. Also -- that's the objection. You can answer.

A I'm confused because, obviously, he was acting alone. Mr. Gottesman was retained. I would not ask someone to do something if I have retained an attorney. I don't know if there is something confusing between my mother and Mr. Zucker, but I'm unaware and I have no knowledge.

Q So you're suggesting that, perhaps, maybe your mother asked Mr. Zucker to inquire?

A Or perhaps he was doing it on his own.

Q As your insurance agent?

A Yes. It says for Gloria Wiseman, but the number is G, so that would be my mother; is that not correct?

MR. GOTTESMAN: You're not asking the questions.

THE WITNESS: I am so not used to this.

MR. GOTTESMAN: The attorney is

Page 103

G. Wiseman

going to ask questions and you're going to answer the question.

BY MR. JOHNSON:

Q The question, Dr. Wiseman, is:

If Mr. Zucker had shared with you the information that's in Exhibit 7, would you have been interested in paying $66,000 a year in premiums for a $300,000 life insurance contract on your mother?

A It appears to be slightly better than the one that was offered before but not much. It's a lot of money per month. It would end up being similar to the one that's offered to Mr. Gottesman for my mother and for me.

As I said before, I don't have that kind of money at this point in time.

Q So you would have declined to proceed with this exchange if you had known about this?

A It does not seem very practical to give 300 or almost 300 to be able to now, at this point in time, get to be over 100 and get 300,000.

Page 104

G. Wiseman

I cannot think about it clearly unless I know that I have the kind of money to put in. It does not seem practical but I don't see how I could afford this now.

Q And I believe, if I understand your testimony, Dr. Wiseman, it is that if you had seen in the written contract that it was not a whole life policy, you would have taken steps when your mother was much younger to move to a whole life policy; is that correct?

A Yes.

Q And the contract would have been cheaper since your mother would have been much younger; is that correct?

A That's correct.

MR. JOHNSON: This one is Exhibit 9.

(Whereupon, Letter from ReliaStar Life Insurance Company of New York to New York Department of Financial Services, dated March 11, 2016, was marked as Defendants'

Page 105

G. Wiseman

Exhibit 9 for identification, as of this date.)

BY MR. JOHNSON:

Q Exhibit 9 is a letter from ReliaStar to the Consumer Assistance Unit of the New York Department of Financial Services.

Do you see that?

A Yes.

Q And on the second page you are shown as a carbon copy.

Is that your address there?

A The second page?

Q Yes.

A Yes.

Q I've also seen in some of the documents an address in Manhattan, Fort Washington, I want to say.

A That's my mother's apartment.

Q Does she still live there?

A Yes, she does.

Q Did you receive a copy of what was marked as Exhibit 9 as the Teaneck, New Jersey address?

Page 106

G. Wiseman

A I don't recall.

Q Dr. Wiseman, focusing on the first two pages of this document, it is a two-page letter and there are a number of attachments with the letter that comprise the remainder of Exhibit 9.

A Uh-huh.

Q With respect to the first two pages of the letter to the New York Department of Financial Services, can you identify anything that is inaccurate on those two pages?

A I have no way of knowing if it is accurate that the maturity at age 95 is a common policy provision in the life insurance industry in 1991 when the policy was issued.

Also, the letter states, "Policy maturity date was shown on the policy date of pages the owner received at issue". Either I or my mother have the originals. We tend to keep stuff. We don't have it. Don't remember seeing it.

Q So you're disputing that the

Page 107

G. Wiseman

owner received the policy pages?

A I have no way of knowing. I didn't see it and I cannot attest to saying that it is accurate about the maturity age 95 is a common policy provision.

MR. GOTTESMAN: If I may, first of all, can you read back the question?

BY MR. JOHNSON:

Q I was going to say the same thing. I think the question is: Is there anything inaccurate --

MR. GOTTESMAN: Would it be easier if we go through sentence by sentence whether she knows of an inaccuracy in that sentence whether she does or doesn't? Rather than the --

MR. JOHNSON: I think the witness has already indicated that there are some matters on which she has no knowledge one way or the other. All I'm interested in are matters on

Page 108

G. Wiseman

which she has knowledge and she knows the statement to be incorrect.

MR. GOTTESMAN: Well, I'm going to object to that because some of this requires legal knowledge, knowledge of the insurance industry, and knowledge of what ReliaStar did and how it responded to various things.

So she can answer, but I don't know if she's -- if the question is a question she is able to answer in this letter.

Can you just read back the question?

MR. JOHNSON: I think I've modified the question since the original iteration of it.

MR. GOTTESMAN: Okay. What's the new iteration?

BY MR. JOHNSON:

Q The new iteration is: On the first two pages of Exhibit 9, are there any statements --

MR. JOHNSON: Strike that.

Page 109

G. Wiseman

Q On the first two pages of Exhibit 9, are there any factual statements that you know to be inaccurate?

A I don't know, but I'll make the same comment, that the company is not currently of a whole life or endowment insurance is not available for issue. And insured at age 94. I have no knowledge of the company not having it.

The duplicate that we got, I don't know if that was the original from Lincoln. It looks different from what you showed from Lincoln in one of your exhibits. That was not what I received or my mother received.

MR. GOTTESMAN: If we're going to do this in a scatter shot way, wouldn't it be more efficient to go through the letter sentence by sentence and ask is this sentence known to be accurate or inaccurate, rather than a scatter shot letter that hasn't been seen before being piece meal and discussed?

Page 110

G. Wiseman

BY MR. JOHNSON:

Q Is that all your testimony on the first two pages of Exhibit 9, Dr. Wiseman?

A This is also discussing attachments that I haven't looked at yet and I have no way of saying if there is any flexible premium or universal lifetime policy premium is required, et cetera.

"If the policy owner wants to keep the current life insurance in force to its maturity date". I am not in insurance, I don't know that to be true.

Q Do you know it to be false?

A I have no way of knowing. I'm not in the insurance business.

Q All I'm asking is statements that you know to be false. And, again, just the first two pages.

A I had no knowledge that it was not a whole life insurance policy before later in time. I mean, around late 2014, 2015. But there is a lot I can't comment on because I'm not in the insurance

Page 111

G. Wiseman

business and I'm not a lawyer.

Q And I understand that.

With respect to the exhibits we've marked as Exhibit 1, which is your mother's contract and Exhibit 5, which is your own contract --

A Yes.

Q -- do you have any reason to believe that those are not, in fact, the terms that govern those insurance contracts?

A I did not see it at the time so I can't say that I know it to be true or not true. You're showing me February 1, 2018 about something which should have existed that I did not get in 1994.

Q So how do you know --

A 1991.

Q How do you know you have a contract with an exchange provision then?

A Because whatever sample I was shown had about the exchange, the present ones also have about the exchange but if you have a policy.

Page 112

G. Wiseman

Q Do you have any reason to believe that your contract with ReliaStar contains terms that are more favorable to you that are set forth in Exhibit 5?

A I have no way of knowing.

Q Other than Mr. Zucker, Mr. Pinczower, Mr. Agee and Mr. Gottesman, have anyone else represented you in any capacity in your dealings with ReliaStar?

A I also tried to deal with Voya ReliaStar. Does that count?

Q Who did?

A I did.

Q Anyone else?

A The ones that you named. I don't recall anyone else.

Q Did ReliaStar or any of its predecessors ever do anything to prevent you from knowing the terms of your contract?

A Actually, yes.

Q What did they do?

A I get yearly bills. In my bills, the ones that I see, I don't see,

Page 113

G. Wiseman

oh, and by the way, you have to die by then, or reiterating that they are not whole life. But you get billed year after year after year.

Q How did that prevent you from learning the terms of your contract or prevent you from learning that it was not, in fact, a whole life policy?

A To be honest, I believe there are other companies who write, who after you pay the bill will give you summaries, send you information, which if you know something is messed up, will pique your interest. I recall only receiving bills.

Q Did you ever wonder what the terms of your contract were?

A Unfortunately, I assumed it was what I thought it was.

Q Which was a whole life policy?

A Yes. I work almost every day of the week. I work late. I got married. I had two kids. I got divorced. There was, like, no time to really be able to sit down and say, okay, now I can review and

Page 114

G. Wiseman

check on anything.

Yes, I would have liked to but apparently it didn't occur either. But I was able to assume so because I did not get information from the company that frequently other companies send out regularly.

Q Did you ever speak with anyone from Lincoln after you bought the policy?

A I don't recall.

Q Do you have a written engagement letter with Mr. Gottesman and his law firm? That's just a "yes" or "no" question.

A I believe so.

Q Do you have a written engagement letter with any other lawyers or law firms relating to this lawsuit?

A No, not to my knowledge.

Q To your knowledge, is any lawyer representing you in this lawsuit besides Mr. Gottesman?

A Not to my knowledge.

Q What do you understand your

Page 115

G. Wiseman

responsibilities to be as a class representative in a class action?

A I'm not a lawyer. My understanding as a non-lawyer, as a regular person, is that a class action is for when somebody or a company does something wrong or unfair or inappropriate to one person, you can sue.

Then if you do it to someone else, and very likely because, as you guys state, and wherever it was here that that is a practice, that is the practice.

So I don't agree, I don't like your practices. I don't think it was appropriate what happened to my mother. I think it is outrageous. It might be just as outrageous for me. My mother is not likely to be the only person that has lost all her money that they put in and their expectations because they didn't drop dead in time.

I imagine that there are a lot of people out there who this has happened to.

Page 116

G. Wiseman

Q You imagine it. Do you know of anyone else who sought to exchange and was unable to?

A No, but I'm sure if this was public, there would be a lot of people coming forward.

Q Did Mr. Zucker tell you that he has had other clients who have experienced something like this?

A He may have. I don't think -- we did not have a specific conversation but I believe he has.

Q You believe he has what?

A He likely has that experience. After all, he told me to get a lawyer.

Q You haven't asked him whether he knows of anyone else that has had the same experience?

A Yes. I'm saying the odds are there are others out there.

Q I'm not interested in odds. I'm interested in facts.

Do you know of one other person out there who tried to exchange and was

Page 117

G. Wiseman

unable to to their satisfaction?

A I don't know of anyone specifically. However, the number of times that I was told no on the phone when I called to speak to people at Voya until I started to put it in writing, just no, no, no.

I couldn't possibly be the only one that called up and kept on being told no. Or someone like this, you get to pay $300,000 and in a few years, if you died by then, you get back the 300,000. If you have not died by then, then you have lost yet another 300,000.

Q Would you agree with me that any person who purchased this policy and received a copy of the policy would understand it is not a whole life policy?

MR. GOTTESMAN: Objection. Calls for hearsay and what other people might think. You can answer.

A I mean, I don't know. It depends, A, if they got the policy, and, B, if they read it carefully, and, C, if

Page 118

G. Wiseman

they understood it.

Q Understood what the maturity date was?

A Yes.

Q But you don't know what other people think or understand or expect, right?

A No.

Q Have you ever tried to sell your contract to a third-party?

A Sell my contract to someone else?

Q Correct.

A How can you sell your life insurance to someone else?

MR. GOTTESMAN: Just answer the question.

Q It is a bizarre concept.

A No.

Q You're not aware of any secondary market for life insurance contracts?

A No.

Q And you have never tried to

Page 119

enter into that market, right?

A No.

Q And you probably wouldn't sell your contract on your own life to a stranger, would you?

A No.

MR. JOHNSON: Let me take a quick break and I may be done. Let's go off the record.

(Discussion held off the record)

MR. JOHNSON: I have no further questions for this witness.

(Time noted: 1:50 p.m.)

________________________
GLORIA D. WISEMAN

Subscribed and sworn to
before me this day
of , 2018.
________________________

Page 120

--------------- I N D E X ---------------

| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| GLORIA WISEMAN | | |
| | MR. JOHNSON | 5 |

--------------- EXHIBITS ---------------

| DEFENDANTS' | | FOR ID. |
|---|---|---|
| 1 | Contract by Lincoln Life Insurance Company | 23 |
| 2 | Service Information Report from ING for Gloria D. Wiseman | 46 |
| 3 | Letter from Gloria Wiseman to Angela LeClair-Cardinal at Voya | 62 |
| 4 | Letter to Department of Financial Services dated December 22, 2015 | 79 |
| 5 | Contract from Lincoln Security Life Insurance Company | 88 |
| 6 | E-mail from Andrea Nelson to Mr. Gottesman, dated March 18, 2016 | 92 |
| 7 | E-mail from Brian Mueller to Murray Zucker dated December 4, 2017 | 98 |
| 8 | Voya Duration Universal Life Illustration | 100 |
| 9 | Letter from ReliaStar Life Insurance Company of New York to New York Department of Financial Services, dated March 11, 2016 | 104 |

C E R T I F I C A T E

STATE OF NEW YORK )

: SS

COUNTY OF NEW YORK)

I, Adrienne M. Mignano, a Registered Professional Reporter and Notary Public within and for the State of New York, do hereby certify:

That GLORIA D. WISEMAN, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by the witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 5th day of February 2018.

_________________________

ADRIENNE M. MIGNANO

DEPOSITION ERRATA SHEET

Our Assignment No: J124887

Case Caption: Gloria D. Wiseman

vs.

ING Groep, N.V., Voya Financial, et al

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

SIGNATURE_________________DATE:__________

GLORIA D. WISEMAN

Subscribed and sworn to on the ____ day of ____________, 20__ before me,

_________________________________________

Notary Public,
in and for the State of ________________

DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:______________________________
Reason for change:______________________________

Page No._____Line No._____Change to:______________________________
Reason for change:______________________________

Page No._____Line No._____Change to:______________________________
Reason for change:______________________________

Page No._____Line No._____Change to:______________________________
Reason for change:______________________________

Page No._____Line No._____Change to:______________________________
Reason for change:______________________________

Page No._____Line No._____Change to:______________________________
Reason for change:______________________________

Page No._____Line No._____Change to:______________________________
Reason for change:______________________________

SIGNATURE:_______________DATE:_______
GLORIA D. WISEMAN

DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:______________________________
Reason for change:______________________________

Page No._____Line No._____Change to:______________________________
Reason for change:______________________________

Page No._____Line No._____Change to:______________________________
Reason for change:______________________________

Page No._____Line No._____Change to:______________________________
Reason for change:______________________________

Page No._____Line No._____Change to:______________________________
Reason for change:______________________________

Page No._____Line No._____Change to:______________________________
Reason for change:______________________________

Page No._____Line No._____Change to:______________________________
Reason for change:______________________________

SIGNATURE:_______________DATE:_______
GLORIA D. WISEMAN